142 F.3d 907
 John R. KRUSE; Kruse for Council Committee; Thomas E.
Brinkman, Jr.; and Mark W. Miller, Plaintiffs-Appellees,
v.
CITY OF CINCINNATI; Roxanne Qualls, Councilmember and Mayor
of the City of Cincinnati; Dwight Tillery, Councilmember;
Tyrone Yates, Councilmember; Todd Portune, Councilmember;
Bobbie Sterne, Councilmember; Philip M. Heimlich,
Councilmember; Minette J. Cooper, Councilmember; Thomas A.
Luken, Councilmember; Nicholas J. Vehr, Councilmember;
Charles Winburn, Councilmember; and John F. Shirey, City
Manager of the City of Cincinnati, Defendants-Appellants (97-3194),
Charter Committee of Greater Cincinnati; Hamilton County
Democratic Party; and A. Matthew Rosen,
Intervenor-Defendants-Appellants (97-3193),
African-American Small Business Committee, PAC; and Barbara
Milon, Intervenor-Defendants-Appellants (97-3210).
 Nos. 97-3193, 97-3194 and 97-3210.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 17, 1998.
Decided April 27, 1998.
Rehearings and Suggestions for Rehearings En Banc Denied June 18, 1998.
 
 Michael A. Carvin (argued), Cooper, Carvin & Rosenthal, Washington, DC, Christopher Paul Finney (briefed), David R. Langdon (briefed), Finney, Bacon & Muehlenkamp, Cincinnati, OH, for Plaintiffs-Appellees.
 Karl P. Kadon, III (briefed), City Solicitor's Office for the City of Cincinnati, Cincinnati, OH, Brenda Wright, John C. Bonifaz (argued and briefed), National Voting Rights Institute, Boston, MA, for Defendants-Appellants in No. 97-3194.
 Donald J. Mooney, Jr. (argued and briefed), Benesch, Friedlander, Coplan & Aronoff, Cincinnati, OH, for Intervenor-Defendants-Appellants in No. 97-3193
 Eric H. Kearney (briefed), Cohen, Todd, Kite & Stanford, Cincinnati, OH, for Intervenor-Defendants-Appellants in No. 97-3210.
 Elizabeth M. Osenbaugh (briefed), Department of Justice, Des Moines, IA, for Amicus Curiae State of Arizona.
 Burt Neuborne (briefed), Brennan Center for Justice at New York University School of Law, New York City, for Amicus Curiae Brennan Center for Justice.
 Before: KENNEDY and SILER, Circuit Judges; COHN, District Judge.*
 KENNEDY, J., delivered the opinion of the court, in which SILER, J., joined. COHN, D.J. (pp. 919-920), delivered a separate concurring opinion.
 OPINION
 KENNEDY, Circuit Judge.
 
 
 1
 Defendants and intervenor-defendants appeal the District Court's judgment striking down City of Cincinnati Ordinance 240-1995 which places a $140,000 limit on city council campaign expenditures because it violates the First Amendment. The parties supporting the Ordinance[1] argue that the interests furthered by this campaign expenditure limitation are different in kind and degree from the governmental interests the Supreme Court considered and rejected as constitutionally insufficient in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and on that basis urge this Court to distinguish Buckley and uphold the Ordinance. Their characterizations to the contrary notwithstanding, the parties have not presented this Court with governmental interests different than those considered and rejected by the Supreme Court in Buckley and its progeny. We will therefore AFFIRM the decision of the District Court.
 
 I. BACKGROUND
 
 2
 After witnessing a steady rise in the cost of running a successful campaign for city council,[2] the Cincinnati City Council passed City Ordinance 240-1995 (the "Ordinance"), which places a cap on campaign expenditures.[3] Under the Ordinance, a city council candidate cannot spend more than three times the annual salary of a Cincinnati councilmember, or, approximately $140,000 at the present time. The Ordinance provides in pertinent part:
 
 
 3
 WHEREAS, it is the sense of the Council that limitations on campaign expenditures are the most effective means of promoting meaningful campaign reform; now, therefore,
 
 
 4
 BE IT ORDAINED by the Council of the city of Cincinnati, state of Ohio:
 
 
 5
 * * *
 
 
 6
 Sec. 115-3. Expenditure[4] Limits.
 
 
 7
 The total amount of expenditures made in the election cycle by a candidate or the campaign committee of a candidate for the council shall not exceed three times the annual compensation provided for the office to which a candidate seeks election.
 
 
 8
 The City Council passed the Ordinance despite the legal opinion of the City Solicitor that expenditure limits are unconstitutional under Buckley: "As we have previously advised the Council and the Campaign Finance Advisory Board,[5] the U.S. Supreme Court has found expenditure limits to be unconstitutional in the case of Buckley v. Valeo, [424 U.S. 1, 96 S.Ct. 612 (1976) ]. The holding in this case remains the law on the subject of campaign expenditures and is directly on point as to legislative impositions of such expenditures." A majority of the Campaign Finance Advisory Board also counseled the City against enacting spending limits because of the authority of Buckley. Proponents of spending limits however believed that the City "should challenge" the decision and "take the lead on revisiting the Supreme Court's decision" by enacting spending limits.
 
 
 9
 In November, 1995, the City Council enacted Ordinance No. 336-1995 which placed limits on campaign contributions in city council elections and imposed disclosure requirements in addition to those imposed by state law.[6] The contribution restrictions comprise a $1,000 limit on individuals; a $2,500 limit on political action committees ("PACs") and campaign committees; and a $10,000 limit on political parties. The City placed no limitation on the amount of personal funds a candidate may contribute to the candidate's own campaign and no limits on independent expenditures.[7]
 
 
 10
 Plaintiffs John Kruse, a losing candidate in the 1995 city council election who spent more than $140,000 on his campaign; Kruse for Council Committee; Thomas E. Brinkman, a financial contributor to council candidates and potential council candidate; and Mark W. Miller, a financial contributor to council candidates (hereinafter collectively referred to as "Kruse") filed this action challenging the City's spending limit as facially unconstitutional. Kruse sued the City of Cincinnati, the City Manager and members of the City Council in their official capacities (hereinafter collectively referred to as the "City" or "defendants"). The Charter Committee of Greater Cincinnati;[8] the Hamilton County Democratic Party; and A. Matthew Rosen, a former and prospective city council candidate (hereinafter collectively referred to as the "Charter Committee"), intervened on behalf of defendants. The African American Small Business Committee, PAC;[9] and Barbara Milon, an African American candidate for city council in 1993 (hereinafter collectively referred to as "AASBC-PAC"), also intervened on behalf of defendants.
 
 
 11
 The parties agreed to a preliminary injunction enjoining enforcement of the Ordinance throughout the litigation. Plaintiffs filed their motion for summary judgment on July 5, 1996. Defendants filed their opposition, which set forth the factual basis for the Council's action. Attachments included the results of a study, commissioned by the City, of the impact of money in Cincinnati city council elections. The study was conducted by the Center of Responsive Politics, a non-partisan, non-profit research organization that tracks campaign contributions in U.S. elections. It concluded that "the rise in the overall cost of city council races has caused a corresponding rise in the influence of wealthy donors in the City's elections, with such donors increasingly dominating the campaign financing process ... and small donors ... becoming marginal players in that process."
 
 
 12
 Defendants also attached the results of a public opinion survey which gauged the attitude of Cincinnatians on the subject of money in city council elections. The research project, which comprised focus groups and telephone surveys, was conducted by the Deardourff/The Media Company, a planning, consulting, and public opinion research firm. The researchers concluded that an overwhelming majority of residents believe that large contributors wield undue influence on the political system as a whole; that ordinary voters are unable to participate on equal footing in the process; that wealthy candidates unfairly drown out candidates with fewer resources; that the high costs of elections discourage qualified individuals from running for office, which deprives voters of a full choice of candidates; and that overall, money is undermining the fairness and integrity of the political system and causing them to lose faith in the democratic process.
 
 
 13
 Defendants also attached numerous affidavits from current and former councilmembers concerning the corrupting nature of money in Cincinnati politics and similar statements from groups such as the League of Women Voters and Common Cause. There were also affidavits relating to the ability of candidates to run a meaningful campaign on $140,000.
 
 
 14
 For purposes of the summary judgment motion, Kruse accepted as true all facts alleged by defendants in their opposition. Kruse argued that under any set of facts proven by defendants, the Ordinance still fails to pass constitutional muster. The District Court agreed and, under the authority of Buckley, held the Ordinance unconstitutional on its face. Defendants and intervenor-defendants filed timely notices of appeal. We have jurisdiction under 28 U.S.C. § 1291. We review a grant of summary judgment de novo. Bush v. Rauch, 38 F.3d 842, 846 (6th Cir.1994).
 
 II. DISCUSSION
 A. Buckley
 And Its Progeny
 
 15
 "The central holding in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 ... (1976) (per curiam), is that spending money on one's own speech must be permitted...." Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n, 518 U.S. 604, 627, 116 S.Ct. 2309, 2321, 135 L.Ed.2d 795 (1996) (Kennedy, J., joined by Rehnquist, C.J. and Scalia, J., concurring in part and dissenting in part) ("Colo. Republican ")[10] (citing Buckley, 424 U.S. at 44-58, 96 S.Ct. at 646-54); see also, Buckley, 424 U.S. at 266, 96 S.Ct. at 748-49 ("The Court ... holds that a candidate has a constitutional right to spend unlimited amounts of money ... in order to be elected.") (White, J., dissenting). Any judicial consideration of the constitutionality of campaign finance reform legislation must begin and usually ends with the comprehensive decision in Buckley. The Buckley court considered constitutional challenges to several sections of the Federal Election Campaign Act of 1971, as amended by the Federal Election Campaign Act Amendments of 1974 (the "Act"). The legislation reformed federal campaign financing by, inter alia, placing limits on federal campaign contributions and expenditures. The Buckley court drew a general distinction between limitations on campaign contributions, which are constitutionally justified by the compelling state interest of preventing corruption and the appearance of corruption in the electoral process, and limitations on independent campaign expenditures, which are unconstitutional because they cannot be similarly justified. Fed. Election Comm'n v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 491, 105 S.Ct. 1459, 1465-66, 84 L.Ed.2d 455 (1985) ("NC-PAC ") (generally so describing Buckley ).
 
 
 16
 For our present purposes, we are most concerned with what the Buckley court had to say about limitations on campaign expenditures and infringement of First Amendment freedoms.
 
 
 17
 The Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). Although First Amendment protections are not confined to "the exposition of ideas," Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948), "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs .... of course includ(ing) discussions of candidates...." Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 ... (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."
 
 
 18
 Buckley, 424 U.S. at 14-15, 96 S.Ct. at 632. The Court, equating spending money with speech, determined that limitations on campaign expenditures directly and acutely impinged upon political expression at the heart of the First Amendment:
 
 
 19
 A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.
 
 
 20
 Id. at 19, 96 S.Ct. at 634-35.
 
 
 21
 1. Restrictions On Campaign Spending Will Be Strictly Scrutinized
 
 
 22
 Because expenditure limitations restrict political expression at the core of the electoral process and the First Amendment, the Court subjected the restrictions to "exacting scrutiny." Id. at 39, 44-45, 96 S.Ct. at 644-45, 646-47. Restrictions so burdening political speech can survive a constitutional attack only if justified by a compelling state interest, Fed. Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 251-52, 107 S.Ct. 616, 624-25, 93 L.Ed.2d 539 (1986) (citing Buckley, 424 U.S. at 44-45, 96 S.Ct. at 646-47), and narrowly tailored to serve that interest, NC-PAC, 470 U.S. at 496, 105 S.Ct. at 1468. We reject the City's argument that a standard less rigorous than strict scrutiny should be used to review governmental restrictions of core First Amendment speech. See, e.g., City of Cincinnati Br. at 13 n. 2 (Buckley court never employed strict scrutiny language). The Buckley court explained that it was subjecting the Act's expenditure limitations to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." Buckley, 424 U.S. at 44-45, 96 S.Ct. at 647. Assuming, arguendo, Buckley left room for doubt surrounding the appropriate standard of review, the Supreme Court's subsequent cases cited above make clear that strict scrutiny applies. See also, Colo. Republican, 518 U.S. at 640-42, 116 S.Ct. at 2328 (Thomas, J., dissenting) ("Curbs on protected speech, we have repeatedly said, must be strictly scrutinized.")
 
 
 23
 Neither is there support for the Charter Committee's contention that states have more latitude than the federal government in regulating the First Amendment expression of its citizens. Indeed, the Supreme Court has stated emphatically to the contrary: "[T]he proposition that the several States have no greater power to restrain the individual freedoms protected by the First Amendment than does the Congress of the United States" is "firmly embedded in our constitutional jurisprudence." Wallace v. Jaffree, 472 U.S. 38, 48-49, 105 S.Ct. 2479, 2485, 86 L.Ed.2d 29 (1985). The Supreme Court has employed strict scrutiny when considering state restrictions on campaign expenditures. Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 657, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990) ("To determine whether Michigan's restriction on corporate political expenditures may constitutionally be applied to the Chamber, we must ascertain whether it burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest."); First National Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 1420-21, 55 L.Ed.2d 707 (1978) ("The constitutionality of [Massachusetts' restriction of corporate expenditures to influence the outcome of public referendums] turns on whether it can survive exacting scrutiny" which requires showing "closely drawn means" of furthering a "compelling" state interest.).
 
 
 24
 2. The Supreme Court Has Identified Only One Governmental
 
 
 25
 Interest Supporting Campaign Finance Reform That
 
 Survives Strict Scrutiny
 
 26
 Thus far, the Supreme Court has identified only one "legitimate and compelling" governmental interest that justifies restrictions on campaign financing: the prevention of corruption or the appearance of corruption. NC-PAC, 470 U.S. at 496-97, 105 S.Ct. at 1468-69. Corruption is defined as "a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial quid pro quo: dollars for political favors." Id. at 497, 105 S.Ct. at 1468. Quid pro quo corruption--both real and perceived--was viewed as a malady so grave as to undermine "the integrity of our system of representative democracy." Buckley, 424 U.S. at 26-27, 96 S.Ct. at 638. The governmental interest in preventing real and perceived quid pro quo corruption provides a "constitutionally sufficient justification" to sustain limitations on contributions by individuals and groups to candidates and campaign committees. Id. at 26-29, 96 S.Ct. at 638-40.[11]
 
 
 27
 In contrast, the Court found that this interest in preventing corruption and the appearance of corruption in the political system (the "anti-corruption rationale"[12]) is inadequate to sustain limitations on independent expenditures by individuals, id. at 45-47, 96 S.Ct. at 647-48, expenditures of a candidate's own money, id. at 52-54, 96 S.Ct. at 651-52, and most pertinent to our inquiry, campaign expenditures, id. at 55-56, 96 S.Ct. at 652-53. The Court reasoned that spending limitations are not narrowly tailored to preventing corruption because the expenditures at issue did not pose the same potential for abuse as contributions. Id. at 46-47; 53; 55, 96 S.Ct. at 647-48; 651; 652. The Court concluded that the Act's contribution limitations and disclosure requirements were the only constitutional means of furthering the anti-corruption rationale. Id. at 55-59, 96 S.Ct. at 652-54.
 
 
 28
 Buckley 's distinction between expenditure ceilings and contribution limits in candidate elections has remained intact.[13] Limitations on independent expenditures by PACs, NC-PAC, 470 U.S. at 496-97, 105 S.Ct. at 1468-69, and political parties, Colo. Republican, 518 U.S. at 615-19, 116 S.Ct. at 2316-17, have been struck down. The lack of tendency in such expenditures to corrupt or give the appearance of corruption led the NC-PAC court to conclude there was no constitutional justification to restrict independent expenditures by PACs. NC-PAC, 470 U.S. at 496-97, 105 S.Ct. at 1468-69. Moreover, the Court held that even if it were to determine that independent expenditures by PACs posed a threat of corruption or the appearance of corruption, the expenditure limitation would be a "fatally overbroad response to that evil." Id. at 498, 105 S.Ct. at 1469. In Colorado Republican, the Court underscored its previous holdings in this area before striking down independent expenditures by political parties: "We do not see how a Constitution that grants to individuals, candidates, and ordinary political committees the right to make unlimited independent expenditures could deny the same right to political parties." 518 U.S. at 617-19, 116 S.Ct. at 2317 (emphasis supplied). A majority of the Court joined in holding independent expenditures immune from regulation as a matter of law.[14]
 
 
 29
 3. Other Governmental Interests Supporting Campaign Finance
 
 
 30
 Reform Are Insufficient To Justify Infringement Of
 
 First Amendment Freedoms
 
 31
 The Buckley court rejected two other governmental interests advanced by Congress as justification for spending caps. First, the Court held that the First Amendment will not countenance equalizing the financial resources of individuals and groups who wish to participate in the electoral process. Buckley, 424 U.S. at 48-49; 54; 56-57, 96 S.Ct. at 648-49; 651-52; 652-53. Next, the Court rejected as illegitimate the government's interest in capping the exorbitant costs of political campaigns. Id. at 57, 96 S.Ct. at 653.
 
 
 32
 Grounded on this legal landscape, we turn to the parties' arguments in defense of Ordinance 240-1995's limitation on campaign expenditures by candidates for city council.B. Buckley
 
 
 33
 And Its Progeny Cannot Be Distinguished And Are
 
 Controlling
 
 34
 1. Campaign Spending Does Not Implicate The Anti-Corruption Rationale
 
 
 35
 The City's main argument is that 20 years of experience has taught us that contribution limitations are not enough to address the problem of the corrupting influence of money in elections. In essence, the City argues that the Buckley court's empirical judgment was wrong. It cites to newspaper articles documenting the abuses in recent federal elections as proof of this contention.
 
 
 36
 As has been demonstrated by the federal election experience over the past twenty-one years, large campaign donors, in a system of unlimited campaign spending, will often bundle their contributions, leading to undue influence on the electoral and legislative processes. Further, the fear that an opponent will spend vast sums of money in pursuit of a campaign victory has fueled a never-ending set of schemes to evade federal limits. During the most recent federal election, limits on contributions were rendered meaningless by the pressure of increasing levels of spending. The result was a campaign finance system characterized by monied interest contributions in the millions of dollars. Ruth Marcus & Charles Babcock, "The System Cracks under Weight of Cash; Candidates, Parties and Outside Interests Dropped a Record $2.7 Billion.," The Washington Post, February 9, 1997, at A1.
 
 
 37
 City Br. at 26-27; see also id. at 30-31 and 31 n. 5 ("As recent events in this nation have shown, contribution limits, alone, will not protect the integrity of the electoral process.") (citing Dawn to Dark/Chasing the Dollars: One Day on the [Federal] Fundraising Trail, The Boston Globe, May 16, 1997, A1).
 
 
 38
 We are not unaware of the excesses of the federal campaign system. However, to the extent the City is relying on its interest in preventing real and perceived quid pro quo corruption,[15] the Supreme Court's decisions in Buckley, NC-PAC and Colorado Republican clearly foreclose this argument as a matter of law. Buckley could be narrowly interpreted to say only that spending limits are unconstitutional because contribution limits are adequate to prevent corruption and the appearance of corruption. See, e.g., Buckley, 424 U.S. at 55, 96 S.Ct. at 652 ("The interest in alleviating the corrupting influence of large contributions is served by the Act's contribution limitations and disclosure provisions rather than by [its] campaign expenditure ceilings."). This reading would leave open the question of what to do if contribution limits prove inadequate. However, NC-PAC and Colorado Republican make eminently clear that spending limits on PACs and political parties are unconstitutional not simply because of the presence of contribution limits but because they are not narrowly tailored to serve this interest. NC-PAC, 470 U.S. at 496-97, 105 S.Ct. at 1468-69; Colo. Republican, 518 U.S. at 613-19, 116 S.Ct. at 2315-17. As the Court reasoned in Colorado Republican, "the lack of coordination between the candidate and the source of the expenditure [alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate and] ... prevents us from assuming, absent convincing evidence to the contrary, that a limitation on political parties' independent expenditures is necessary to combat a substantial danger of corruption to the electoral system." 518 U.S. at 615-19, 116 S.Ct. at 2316-17. A fortiori, the spending of money legally raised by candidates themselves poses no risk of quid pro quo corruption and campaign spending limits cannot be justified by the anti-corruption rationale.
 
 
 39
 Any argument that spending limits are necessary to reduce the incentive to circumvent the limits on contributions was expressly rejected by the Buckley court.
 
 
 40
 [Our earlier discussion] explains why the Act's expenditure limitations impose far greater restraints on the freedom of speech and association than do its contribution limitations. The markedly greater burden on basic freedoms caused by [the expenditure limitations] thus cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations.
 
 
 41
 Buckley, 424 U.S. at 44, 96 S.Ct. at 647.
 
 
 42
 Moreover, were we to consider the City's factual allegations, it has failed to present any evidence that spending limits are necessitated by the failure of contribution limits. The City had no experience with contribution limits at the local level at the time the spending limit was passed; contribution limits were not enacted until after the spending limit at issue here. As a result, the City has no evidence that contribution limits are inadequate to prevent actual and perceived quid pro quo corruption. The City mistakenly relies on the federal experience in national elections with contribution limitations to support its contention that they will inevitably prove inadequate at the local level. The problems uncovered on the federal level are explained primarily by the "soft-money" loophole in contribution restrictions[16] and do not undermine the Supreme Court's conclusion that spending restrictions are not narrowly tailored to addressing the problem of the corrupting nature of money in politics.
 
 
 43
 Next, the parties argue that unlimited campaign spending is eroding the public's trust in city government and that pervasive cynicism is discouraging the public's participation in the democratic process. This is an outgrowth of the problems of actual and perceived quid pro quo corruption discussed at length above and of the inequalities of private economic power discussed below and therefore cannot provide constitutionally sufficient justification for campaign spending restrictions. We do not believe it can be severed as a "new" form of corruption the Supreme Court has not considered. Even if it could, as Kruse points out, it was advanced as a separate interest by the government in Buckley. See Kruse's Br. at 14 n. 9 (interests advanced by the government as compelling include "the alienation from and disillusionment in the electoral process by this country's citizens") (quoting Buckley v. Valeo, 519 F.2d 821, 913 (D.C.Cir.1975) (Tamm, J., concurring in part and dissenting in part)). While not separately addressed, the Supreme Court held that "[n]o governmental interest that has been suggested is sufficient to justify the restriction on the quantity of political expression imposed by" the ceiling on campaign expenditures. Buckley, 424 U.S. at 55, 96 S.Ct. at 652.
 
 
 44
 2. The Interest In Curbing The Rising Costs Of Campaigns Is
 
 
 45
 An Insufficient Justification For Spending Limits
 
 
 46
 The Brennan Center as amicus argues that the Ordinance is supported by a compelling governmental interest not considered by the Buckley court: "combating the demonstrated corrosive effects on the democratic process of uncontrollable campaign spending." The Brennan Center and the States as amici focus on the inordinate amount of time candidates for office and officeholders are forced to spend raising adequate funds for office, which in turn fosters such a pervasive level of public cynicism that people are losing faith in American democracy and staying away from the polls. This argument is also answered by Buckley. The Court held that the interest in "reducing the allegedly skyrocketing costs of political campaigns" is not compelling or sufficient to justify restrictions on campaign spending. Buckley, 424 U.S. at 57, 96 S.Ct. at 653.
 
 
 47
 The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the people--individually as citizens and candidates and collectively as associations and political committees--who must retain control over the quantity and range of debate on public issues in a political campaign.
 
 
 48
 Id. (footnote omitted). The need to spend a large amount of time fundraising is a direct outgrowth of the high costs of campaigns. However, because the government cannot constitutionally limit the cost of campaigns, the need to spend time raising money, which admittedly detracts an officeholder from doing her job, cannot serve as a basis for limiting campaign spending.
 
 
 49
 3. The Interest In Leveling The Playing Field Is An
 
 
 50
 Insufficient Justification For Spending Limits
 
 
 51
 The City initially concedes that Buckley rejected the governmental interest in "equalizing the financial resources of candidates" as a matter of law. City Br. at 18. The City then proceeds to urge this Court to adopt this very interest rejected by the Supreme Court as compelling justification for its campaign spending limit. It frames this interest in a number of ways: 1) candidates without access to wealth are excluded from the electoral process; 2) voters are deprived of a full slate of candidates because otherwise qualified individuals are excluded from running by cost-prohibitive campaigns; 3) voters are deprived of hearing candidates with lesser resources because wealthy candidates effectively drown them out; and 4) voters without access to wealth cannot be heard by candidates because they are drowned out by contributors with more money and influence.
 
 
 52
 These arguments, all concerning or stemming from the notion that the government has an interest in eliminating the advantage of wealth in the electoral process, or "leveling the playing field," are directly rebutted by Buckley:
 
 
 53
 It is argued ... that the ... governmental interest in equalizing the relative ability of individuals and groups to influence the outcome of elections serves to justify the limitation on express advocacy of the election or defeat of candidates imposed by [the Act's] expenditure ceiling[s]. But the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion.
 
 
 54
 Buckley, 424 U.S. at 48-49, 96 S.Ct. at 649 (internal quotations and citations omitted). The Court reasoned further that spending limits "may fail to promote financial equality among candidates" and could instead serve only to protect incumbents and "handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign." Id. at 54, 56-57, 96 S.Ct. at 651-52, 652-53. More fundamentally, the Court concluded that "the First Amendment simply cannot tolerate [the] restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy" whether the source of his money is personal wealth or funds raised from legal contributions. Id. at 54, 96 S.Ct. at 651-52.
 
 
 55
 The City and intervenor-defendant AASBA-PAC frame purportedly different interests as issues implicating the First Amendment rights of relatively poor voters and candidates and the Equal Protection rights of relatively poor and minority voters and candidates. These alleged constitutional interests however are actually the same interest in leveling the playing field just described.[17]
 
 
 56
 The reliance of the City and AASBA-PAC on cases striking down governmentally-imposed barriers to participation in the electoral process in support of their argument that economic inequalities are unconstitutional is in obvious defiance of the Supreme Court's rejection of this very argument based upon the very cases relied upon by the parties.
 
 
 57
 [T]he principles that underlie invalidation of governmentally imposed restrictions on the franchise do not justify governmentally imposed restrictions on political expression. Democracy depends on a well-informed electorate, not a citizenry legislatively limited in its ability to discuss and debate candidates and issues.
 
 
 58
 Id. at 49 n. 55, 96 S.Ct. at 649 n. 55.
 
 
 59
 Again, even if we were to consider the facts in this case relating to alleged economic and racial disparity, the record does not bear out the parties' arguments. In its attempt to show that a meaningful campaign for city council can be run on $140,000 or less, the City factually undercuts its argument that candidates without access to wealth are excluded from the process and that voters are deprived of hearing from these very candidates. Four current councilmembers won by spending less than $140,000. Incumbent Tyrone Yates spent only $33,000 on a successful campaign and successful challenger Minette J. Cooper spent $97,000. These candidates relied upon direct voter contact and participation in candidate forums for communicating their political message to the electorate. The argument of intervenor-defendant AASBA-PAC is more puzzling. It argues that African American voters and candidates suffer a distortional effect as campaign expenditures rise; their representation diminishes. AASBA-PAC Br. at 13. Race enters the calculus because the African American community "has less disposable income available to spend on a campaign." Id. at 16. However, African Americans hold 4 of the 9 council seats, which equates with its 40% representation in the City as a whole. Further, 2 successful African American candidates were among the top fundraisers in the 1995 election. The record fails to support the assertion that candidates without wealth and African Americans are excluded from meaningfully participating in Cincinnati city council elections.
 
 
 60
 4. Spending Limits Cannot Be Justified As A Reasonable
 
 Regulation of the Manner of Speech
 
 61
 As an alternative argument, the City contends that the Ordinance is justified as a reasonable regulation on the manner of speech in the election process of the sort recognized in Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). The City makes this argument despite recognizing it was explicitly rejected in Buckley:
 
 
 62
 Nor can the Act's contribution and expenditure limitations be sustained ... by reference to the constitutional principles reflected in such decisions as ... Kovacs v. Cooper. ... The critical difference between this case and those time, place, and manner cases is that the present Act's contribution and expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties in addition to any reasonable time, place, and manner regulations otherwise imposed.
 
 
 63
 Buckley, 424 U.S. at 18, 96 S.Ct. at 634 (internal citations omitted). The City cannot avoid binding precedent by merely criticizing it as "irrational."
 
 III. CONCLUSION
 
 64
 The parties supporting the Ordinance have failed to advance any governmental interest outside of those interests considered and rejected as constitutionally insufficient by the Buckley court. Their arguments and Cincinnati's motivation for enacting this campaign spending limit have not gone unnoticed by dissenting members of the Supreme Court:
 
 
 65
 Finally, I believe the Government has an important interest in leveling the electoral playing field by constraining the cost of federal campaigns. As Justice White pointed out in his opinion in Buckley, "money is not always equivalent to or used for speech, even in the context of political campaigns." 424 U.S. at 263, 96 S.Ct. at 747 ... (opinion concurring in part and dissenting in part). It is quite wrong to assume that the net effect of limits on contributions and expenditures--which tend to protect equal access to the political arena, to free candidates and their staffs from the interminable burden of fund-raising, and to diminish the importance of repetitive 30-second commercials--will be adverse to the interest in informed debate protected by the First Amendment. See id., at 262-266, 96 S.Ct. at 746-49.
 
 
 66
 Colo. Republican, 518 U.S. at 649-50, 116 S.Ct. at 2332 (Stevens, J., dissenting). These views, however, have been rejected by a majority of the Court. As this case is controlled by Buckley and its progeny, the decision of the District Court is AFFIRMED.
 
 
 67
 COHN, District Judge, concurring.
 
 
 68
 I write separately to add these few words. It should be recognized that Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), was decided on a slender factual record. Similarly, although the City here attempted to develop a compelling factual record, it failed to do so.
 
 
 69
 Additionally, although the majority accurately states that "[t]he need to spend a large amount of time fundraising is a direct outgrowth of the high costs of campaigns," supra at 916, I believe the statement that "because the government cannot constitutionally limit the cost of campaigns, the need to spend time raising money, which admittedly detracts an officeholder from doing her job, cannot serve as a basis for limiting campaign spending," id., goes too far given the factual record. There is an independent interest in freeing officeholders from the pressures of fundraising so they can perform their duties.[1] This interest is not encompassed by the prohibition on limiting the costs of campaigns. Cf. Rosenstiel v. Rodriguez, 101 F.3d 1544, 1553 (8th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997) (noting that with regard to a system of public campaign financing, "the State seeks to promote ... a diminution in the time candidates spend raising campaign contributions, thereby increasing the time available for discussion of the issues and campaigning. It is well settled that [this] governmental interest [is] compelling.") (citing Republican Nat'l Comm. v. Federal Election Comm'n, 487 F.Supp. 280, 285 (S.D.N.Y.) (three-judge court), aff'd mem. 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980)); Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 39 (1st Cir.1993) (stating that when "the legislature has adopted a public funding alternative, the state possesses a valid interest in having candidates accept public financing because such programs ... free candidates from the pressures of fundraising") (citing Buckley, 424 U.S. at 91, 96 S.Ct. at 669). A determination of whether this interest is sufficiently compelling to justify campaign expenditure limits should be left for another day.
 
 
 70
 Similarly, it does not necessarily follow from the Supreme Court's rejection of the interest in limiting the high costs of campaigns that the interest in preserving faith in democracy is per se insufficient to justify the expenditure limits. Given the sparsity of the record, including the fact that the statistics advanced by the City regarding public cynicism were compiled prior to the time the contribution limits and disclosure requirements of City Ordinance No. 336-1995[2] could have any real effect, we should refrain from commenting on whether the interest in preserving the faith of the citizens in our democracy is a mere outgrowth of the interest in limiting the high costs of campaigns.[3]
 
 
 71
 In sum, this is not the case to change the landscape of campaign finance. Put succinctly, the City lost because it failed to develop a compelling factual record and because it asserted the same arguments that were in no uncertain terms rejected by the Supreme Court in Buckley. The Supreme Court's decision in Buckley, however, is not a broad pronouncement declaring all campaign expenditure limits unconstitutional. It may be possible to develop a factual record to establish that the interest in freeing officeholders from the pressures of fundraising so they can perform their duties, or the interest in preserving faith in our democracy, is compelling, and that campaign expenditure limits are a narrowly tailored means of serving such an interest.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 In addition to briefs filed by defendants and defendant-intervenors, amicus briefs urging reversal were filed on behalf of the Brennan Center for Justice and by 33 states through their attorneys general or secretaries of state, and the territory of Guam
 
 
 [2]
 In 1987, 25 city council candidates spent a total of $958,999. In 1995, 18 candidates spent a total of $2,330,000. The highest amount spent by a winning candidate increased by 482% from 1989, $75,000, to 1995, $362,000
 
 
 [3]
 By popular vote, the City amended its City Charter to give the City Council authority to enact campaign finance reform measures that differ from state law
 
 
 [4]
 "Expenditure" is defined as:
 the disbursement or use of either a contribution or personal funds of a candidate for the council or his or her immediate family on behalf of or for the benefit of the candidate for the purpose of advocating his or her election to the council or the defeat of his or her opponent. "Expenditure" does not include an independent expenditure, uncompensated volunteer services, or slate cards, sample ballots, or other publications of a political party that identify all of the candidates endorsed by the party in an election.
 
 
 [5]
 The Campaign Finance Advisory Board, composed of a "diverse group of political interests," was created to make recommendations on campaign finance reform in city council elections to the Council
 
 
 [6]
 This ordinance was repealed to make minor amendments; in 1997 a new ordinance was enacted which included the same contribution limitations and disclosure requirements. City of Cincinnati Ordinance No. 9-1997
 
 
 [7]
 "Independent expenditures" are "communications that in express terms advocate the election or defeat of a clearly identified candidate" and are not controlled or coordinated by that candidate. Buckley, 424 U.S. at 43-47, 96 S.Ct. at 646-48
 
 
 [8]
 The Charter Committee originated in the 1920's, a result of the efforts of reformers to "rid Cincinnati of a corrupt political machine that controlled City government through Council members elected by wards and a directly-elected mayor" by creating a Charter system of government. Charter Comm. Br. at 7. Under the Charter system, Cincinnati councilmembers are elected at large on a non-partisan ballot; voters may elect to vote for up to 9 candidates in order of preference. The 9 top vote getters are elected to the Council and the top vote getter is elected mayor. Id. at 8
 
 
 [9]
 The African American Small Business Committee, PAC, is a political action committee in Hamilton County, Ohio, which has 2 purposes: "1) to seek, develop, and support candidates in elections in Hamilton County; and 2) to strengthen the influence and profitability of African American owned businesses in the political process." AASBC-PAC Br. at 5 n. 2
 
 
 [10]
 Justice Kennedy's opinion concurred in the judgment reached by the Court, which held that limitations on independent campaign expenditures by political parties violate the First Amendment. Colo. Republican, 518 U.S. at 617-19, 116 S.Ct. at 2317 (Breyer, J., joined by O'Connor and Souter, JJ.). As explained below, Justice Kennedy would have reached the question of whether coordinated party expenditures can be regulated, which Justice Breyer declined to do
 
 
 [11]
 As a corollary to this holding, the Court upheld the limitation on contributions by political committees, Buckley, 424 U.S. at 35-36, 96 S.Ct. at 642-43, and the limitation on total contributions by any individual during any calendar year, id. at 38, 96 S.Ct. at 644
 
 
 [12]
 Colo. Republican, 518 U.S. at 646-48, 116 S.Ct. at 2331 (Thomas, J., dissenting) (citation omitted)
 
 
 [13]
 There is one exception which is of no help to defendants. In Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the Supreme Court upheld state-imposed restrictions on expenditures made by corporations on behalf of candidates. The Court identified a compelling interest other than the anti-corruption rationale: "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas". Id. at 660, 110 S.Ct. at 1397. The basis for this holding hinges on the special and more limited nature of a corporation 's First Amendment right to engage in political expression:
 [T]he mere fact that corporations may accumulate large amounts of wealth is not the justification [for the restriction]; rather, the unique state-conferred corporate structure that facilitates the amassing of large treasuries warrants the limit on independent expenditures. Corporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures, just as it can when it assumes the guise of political contributions. We therefore hold that the State has articulated a sufficiently compelling rationale to support is restriction on independent expenditures by corporations.
 Id. at 660, 110 S.Ct. at 1398. The holding in Austin is limited to the political speech of corporations and has no relevance here.
 
 
 [14]
 The Court was fractured on whether it should reach the question of the constitutionality of limitations on coordinated party expenditures. Justice Breyer declined to reach this issue. Colo. Republican, 518 U.S. at 621-25, 116 S.Ct. at 2319-20. The Kennedy plurality found coordinated party expenditures indistinguishable from expenditures by a candidate or a candidate's committee. It reasoned that because the First Amendment does not permit regulation of the latter, it should not permit regulation of the former. Id. at 629-32, 116 S.Ct. at 2323. Similarly, Justice Thomas would have reached the issue and struck down the limitation because "there is only a minimal threat of 'corruption,' as we have understood that term, when a political party spends to support its candidate or to oppose his competitor, whether or not that expenditure is made in concert with the candidate.... [The] heavy burden [of this regulation] on First Amendment rights is not justified by the threat of corruption at which it is assertedly aimed." Id. at 646-48, 116 S.Ct. at 2331
 
 
 [15]
 The City loosely refers to "corruption" and does not clearly define the type of corruption the Ordinance was aimed at eliminating
 
 
 [16]
 For an explanation of the problems with soft money in federal elections see Note, Soft Money: The Current Rules and the Case for Reform, 111 HARV. L.REV. 1323 (1998)
 
 
 [17]
 Recently, the Ninth Circuit rejected similar challenges to the state of California's campaign finance system for judicial elections. NAACP v. Jones, 131 F.3d 1317 (9th Cir.1997). Plaintiffs argued that a "wealth primary" exists in Los Angeles County's system of electing judges which precludes candidates without access to wealth from running a meaningful campaign and which prevents voters without access to wealth from contributing effectively to a candidate in violation of voters' and candidates' rights under the First Amendment and the Equal Protection Clause. The court rejected the equal protection argument that all voters are entitled to the same access to the campaigning process regardless of wealth. "We refuse to attribute societal differences in income or the high cost of running a judicial campaign to the State.... The inability to influence other peoples' votes through campaign contributions is not equivalent to the inability to cast one's own vote.... [There is no right] to have equal access to the campaigning process." Id. at 1323-24
 The court also rejected plaintiffs' First Amendment argument. It held that the First Amendment rights of voters can be no greater than those of the speaker, i.e., the candidate. Id. at 1322. Because the court rejected plaintiffs' argument that candidates have a First Amendment right to public funding, id. at 1322, it rejected the voters' argument as well. "The First Amendment simply does not guarantee access to all of the information a voter would like to receive.... The 'wealth primary' does not burden any fundamental First Amendment rights." Id. at 1323.
 
 
 [1]
 The Brennan Center notes that "[o]ne former Member of Congress estimated that during a campaign he and his staff spent 80% of their time fundraising." Brennan Center Br. at 11 (citing Jamin Raskin and John Bonifaz, The Constitutional Imperative and Practical Superiority of Democratically Financed Elections, 94 Colum. L.Rev. 1160, 1188 (1994)). Further, "[o]ne political consultant has reported that even [President Clinton] has complained 'bitterly' at having to spend so much time fundraising, saying: 'I can't think. I can't act. I can't do anything but go to fundraisers and shake hands. You want me to issue executive orders; I can't focus on a thing but the next fundraiser.' " Id. at 12 (quoting Dick Morris, Behind the Oval Office: Winning the Presidency in the Nineties 150, 151 (1997))
 
 
 [2]
 In 1997 minor amendments were made to City Ordinance No. 336-1995. See City Ordinance No. 9-1997
 
 
 [3]
 The City's ordinance limiting contributions and requiring disclosure was enacted in November 1995, the same year the expenditure limit was enacted. The statistical data advanced by the City regarding the size of contributions and the potential for undue influence were compiled for the 1995 campaign. The public opinion research polls conducted on behalf of the City were undertaken in July 1996 and completed in December 1996. The contribution limits, therefore, did not affect fundraising during the 1995 city council campaign, and presumably did not significantly influence public opinion by December 1996