TYMKOVICH, J.,
affirming, concurring in part and concurring in the result. O’BRIEN, J. joins.
I agree with much of Judge Lucero’s analysis and with the ultimate disposition of the issues on appeal. Specifically, I concur with Parts I, II, and III, and with the analysis of Part IV that is not inconsistent with the following.[1] I write separately for two reasons: First, to explain what I view as the Supreme Court’s narrow application of Buckley’s anti-corruption rationale in campaign expenditure cases. Second, to demonstrate why the other rationales submitted by the City— preservation of officeholder time and promoting electoral competition — are fundamentally at odds with Buckley and its progeny.
The principal opinion’s careful analysis of the evidence presented by Albuquerque leads it to the undoubtedly correct conclusion that the City’s campaign spending restrictions are unconstitutional. I, however, would agree with the Sixth Circuit’s holding that under Buckley such restrictions cannot be supported as a matter of law. See Kruse v. City of Cincinnati, 142 F.3d 907, 915-19 (6th Cir.1998). In particular, I would hold that while prevention of corruption has been recognized as a compelling interest justifying campaign contribution limits, it was specifically rejected by Buckley as a sufficient reason to limit direct campaign spending. Further, in my view the two “new” interests the City asserts in defense of the statute are neither new nor compelling, nor are the spending caps tailored narrowly to serve them. Since all three of the asserted in- *915 terests are thus constitutionally incapable of justifying spending restrictions as a matter of law, the court need not entertain the evidence submitted by the City.

Strict Scrutiny and Buckley v. Valeo

It is true that strict scrutiny does not require automatic invalidation of governmental regulations. See Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 2338, 156 L.Ed.2d 304 (2003). Nevertheless, where core First Amendment principles are at stake, courts must bring a healthy skepticism to claims that individuals spend too much time and money on the political process. Unless the City convinces us that its regulations are necessary to serve a compelling interest, see Federal Election Comm’n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 251-52, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), and are narrowly tailored to serve that interest, we must invalidate them. See Federal Election Comm’n v. Nat’l Conservative Political Action Comm., 470 U.S. 480, 496, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (“NCPAC”).
While I agree it is theoretically possible to bring evidence of corruption in support of spending limitations under Buckley, we should be careful not to credit attempts to reformulate arguments that the Supreme Court rejected long ago. Buckley’s strong affirmation of the free speech rights associated with campaign spending has remained essentially untouched for nearly thirty years. See McConnell v. Fed. Election Comm’n, — U.S. -, 124 S.Ct. 619, 655, 157 L.Ed.2d 491 (2003) (reemphasizing heightened level of scrutiny for restrictions on campaign expenditures). Its central holding on expenditures has stood the test of time, both from judicial tinkering and legislative onslaught. That Albuquerque’s spending caps have evaded judicial review for more than 25 years is quite a feat. After careful deliberation, however, the City’s limits cannot stand under well-established precedent.
I agree that the Buckley Court did not adopt a per se rule against campaign •spending limits. The Court began by explaining the particular importance of First Amendment rights in the arena of political campaigning:
In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971), “it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.”
Buckley, 424 U.S. at 14-15, 96 S.Ct. 612.
The Court went on to address specifically how spending limits impinge upon this right:
A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today’s mass society requires the expenditure of money.
Id. at 19, 96 S.Ct. 612 (footnote omitted). It concluded with a broad holding that government does not have the right to pass judgment on how or why a person expends campaign resources:
The First Amendment denies government the power to determine that spending to promote one’s political views is wasteful, excessive, or unwise. In the *916 free society ordained by our Constitution it is not the government but the people — individually as citizens and candidates and collectively as associations and political committees — who must retain control over the quantity and range of debate on public issues in a political campaign.
Id. at 57, 96 S.Ct. 612.
As Justice White observed in dissent, this is not the language of a Court limiting its decision to the facts before it, or interested in encouraging governments to enact similar restrictions with more elaborate justifications. See id. at 266, 96 S.Ct. 612 (“The Court ... holds that a candidate has a constitutional right to spend unlimited amounts of money, mostly that of other people, in order to be elected.”) (White, J., dissenting).
The hundreds of pages of campaign finance opinions written by the Supreme Court beginning with Buckley and culminating most recently with McConnell may not have left us with many clear rules, but one remains intact: “The central holding in [Buckley] is that spending money on one’s own speech must be permitted....” Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm’n, 518 U.S. 604, 627, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Kennedy, J., concurring in part and dissenting in part). Thus, the Supreme Court has “routinely struck down limitations on independent expenditures by candidates.” Federal Election Comm’n v. Colorado Republican Federal Campaign Comm., 533 U.S. 431, 441, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (“Colorado II”) (emphasis added); see also McConnell, 124 S.Ct. at 655 (reiterating that expenditure limitations will be more closely scrutinized).
One can safely conclude that Buckley forecloses a finding that spending limitations can be narrowly tailored to further governmental justifications other than the anti-corruption interest sustained by the Supreme Court, no matter what evidence may be presented. In short, the City must do more than offer academic distinctions of the rationales rejected in Buckley. Albuquerque failed to do so here.

Corruption and Campaign Expenditures

While I agree with the principal opinion that strict scrutiny does not establish a “per se” restriction on campaign spending schemes, it does set a high standard. The Supreme Court likens “corruption” to the “subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial quid pro quo: dollars for political favors.” NCPAC, 470 U.S. at 497, 105 S.Ct. 1459. Nevertheless, while the Supreme Court has routinely upheld contribution limits under the corruption rationale, it has equally routinely struck down spending restrictions. See Colorado II, 533 U.S. at 440-41, 121 S.Ct. 2351. The reason for the difference is the Court’s determination— grounded in law and common sense- — that expenditures by a candidate to promote the candidate’s political agenda do not pose a particular risk of corrupting the candidate making the expenditure.
While more recent cases appear to have taken a slightly broader view of the corruption rationale on the contribution limits side of the equation, see, e.g., Nixon v. Shrink Missouri Gov’t PAC, 528 U.S. 377, 389, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (expressing concern about “the broader threat from politicians too compliant with the wishes of large contributors”), the Supreme Court as a whole has not yet shown any willingness to do so on the spending side. The Supreme Court’s skeptical view *917 of spending limitations in Buckley is based on a realistic appraisal of modern campaigning. Conveying a campaign message to a large electorate can be costly, whether it is by direct mail, television, radio, or staged events. See Buckley, 424 U.S. at 19-20, 96 S.Ct. 612. While technological innovations such as the internet may make it more economical to reach some segments of the electorate, overall costs are unlikely to go down anytime soon. The bottom line is that political speech can only be communicated where a candidate has the resources to get his views out. See id. at 19, 57, 96 S.Ct. 612.
The quality of contemporary political communications may give us pause, but the First Amendment does not have an exception for messages we find repetitive, in poor taste, or too hard-hitting. The answer to concerns about political campaigning, however, does not rest in arbitrary limits that reduce the amount of speech available to the public with no reduction in real or perceived corruption by candidates or elected officials.[2] The Supreme Court has made it clear that a candidate’s expressing his political views is not corrupting: “There is nothing invidious, improper, or unhealthy in permitting [legally-raised] funds to be spent to carry the candidate’s message to the electorate.” Id. at 56, 96 S.Ct. 612. In other words, the candidate’s spending does nothing to corrupt the candidate. “If a[] candidate can raise $1 from each voter, what evil is exacerbated by allowing that candidate to use all that money for political communication?” Id. at 56 n. 64, 96 S.Ct. 612 (quoting Buckley v. Valeo, 519 F.2d 821, 917 (D.C.Cir.1975) (Tamm, J., dissenting in part)). Thus, candidate spending limitations cannot be justified by the anti-corruption rationale. Id. at 55-57, 96 S.Ct. 612. This is because “[t]he markedly greater burden on basic freedoms caused by [spending limits] cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limits.” Id. at 44, 96 S.Ct. 612.
There is no basis to retreat from Buckley’s essential teaching that campaign spending restrictions are not narrowly tailored to further the governmental interest in reducing corruption. I therefore agree with the Sixth Circuit that “campaign spending limits cannot be justified by the anti-corruption rationale.” Kruse, 142 F.3d at 915. Thus, while Judge Lucero is correct in finding that Albuquerque put forth insufficient evidence to show that its spending limits were necessary to prevent corruption, I doubt that any evidence would sustain such limitations under Buckley.

Fund-raising Burdens on Candidates

Albuquerque advances a second rationale for spending caps: they relieve elected officials of the heavy burden of raising the money they need to spend to get reelected. The principal opinion disagrees with Homans’s and Rue’s argument that this is simply a reformulation of the cost-control rationale considered and rejected by the Supreme Court in Buckley. The opinion distinguishes Buckley’s holding that the “allegedly skyrocketing cost of political campaigns” is not an interest that can support spending restrictions, 424 U.S. *918 at 57, 96 S.Ct. 612, by concluding that the Buckley Court was concerned only with “the woes of poor challengers,” not the distractions faced by officeholders. Supra at 912.
It is true that the woes of underfunded challengers and the distractions of officeholders are not the same, and Buckley does not explicitly mention the latter. Both concerns are, however, aspects of the broader interest in controlling the costs of campaigns, an issue the Buckley Court did consider and firmly reject. The Court said, “The First Amendment denies government the power to determine that spending to promote one’s political views is wasteful, excessive, or unwise.” Buckley, 424 U.S. at 57, 96 S.Ct. 612. This is not limited to protecting the interests of underfunded challengers. The Court is clearly and explicitly addressing whether the government may wrest from “the people — individually as citizens and candidates and collectively as associations and political committees — control over the quantity and range of debate on public issues in a political campaign” because it feels the time and money spent on campaigns could be better utilized on other endeavors. Id. If the “mere growth” of the cost of campaigns “provides no basis for governmental restrictions on the quantity of campaign spending,” see id. (emphasis added), a mere consequence of that growth — more time spent fund-raising — certainly cannot provide such a basis. This is so even if Albuquerque’s city councilors believe candidates are spending wasteful, excessive, or unwise amounts of money on their campaigns or if candidates would prefer to have more time for other activities.
Because Buckley rejected this broad argument in favor of spending caps, it did not need to address each of the numerous subordinate arguments the parties in that case put forth. But it is worth noting that contrary to the City’s contention the Buckley Court did consider the exact argument made here, that the “thirst for money has forced candidates to divert time and energy to fund-raising and away from other activities, such as addressing the substantive issues.” Buckley, Br. of Appellees Center for Public Financing of Elections, Common Cause, League of Women Voters of the United States at 72-73 (quoting Senator Humphrey: “Campaign financing is a curse. It’s the most disgusting, demeaning, disenchanting, debilitating experience of a politician’s life. It’s stinky. It’s lousy. I just can’t tell you how much I hate it.”).
Since Buckley is directly controlling, I would again agree with the Sixth Circuit and reject this proposed justification without reaching the details of Albuquerque’s arguments. See Kruse, 142 F.3d at 916-17 (“[T]he need to spend time raising money, which admittedly detracts an officeholder from doing her job, cannot serve as a basis for limiting campaign spending.”).
The principal opinion nonetheless deals effectively with the City’s factual arguments on this point. That legislators might wish to free themselves from the pressures of fund-raising is not surprising. Fund-raising is hard work and can be quite time consuming. Few candidates reportedly like it. What is surprising is that many commentators, normally so exacting in their criticism of the self-dealing of the political branches, are willing to accept the most optimistic projections about reform proposals’ likely effects. See generally Lillian R. BeVier, What Ails Us?, 112 Yale L.J. 1135, 1138 (2003) (commenting on how most campaign finance proposals miss the reformers’ target).
The principal opinion is quite right that the City presented no plausible evidence that the quality of municipal governance or legislation had been harmed by inattentive *919 law makers, nor that elected officials’ work product would substantially improve because the officials could spend more time on the job. It is doubtful that Albuquerque’s elected officials would admit that they have been unable to provide quality governance despite the rigors of campaigning. In any event, courts are not in a position to make such judgments about the quality of legislation based on such an illusory rationale. See Buckley, 424 U.S. at 57, 96 S.Ct. 612.
Furthermore, contrary to former Mayor Baca’s concerns about the increased burdens of fund-raising (itself an echo of the complaints of the appellees in Buckley), officeholders are not “forced” to spend any time making calls or otherwise seeking funds.[3] That they choose to do so (allegedly at the expense of their other duties) seems to be a rather weak reason to override core First Amendment concerns. Freeing politicians from having to make that choice is not a compelling governmental interest.
Finally, of course, whatever the merits of spending limits, they must be narrowly tailored to further the constitutional justification. By way of example, as the principal opinion notes, an approach whose constitutionality has been sanctioned by Buckley is an obvious solution. Buckley upheld voluntary spending limits on presidential campaigns where the candidate accepts public funds. 424 U.S. at 85-86, 96 S.Ct. 612. If the City’s elected officials and its voters truly feel obliged to limit campaign spending, they should be willing to put their money (tax dollars) where their mouths are. A public funding scheme would presumably take fund-raising pressure off of elected officials and also allow challengers to forego the rigors of purely private fund-raising. Another approach would be to raise limits on contributions. Candidates could then save time by seeking fewer, larger, donations. Not only would this free up candidates’ time, but it would also lessen any pressure to evade low contribution limits. Albuquerque’s contribution limits are currently set at five percent of the spending caps; while the record does not disclose the governmental rationale for this formula, there is no reason the City could not revisit these limits in response to the realities of modern campaigning. State and local governments are also free to limit the number of times an individual can run for the same office. Another simple solution would be to expand the number of seats in a given elective body, in this case the Albuquerque City Council. With fewer constituents to represent, and fewer potential voters to persuade, candidates would have to spend less time on all forms of campaigning, including fund-raising.
In short, Albuquerque’s restrictions do not further the objective of reducing corruption. Nor are they “closely drawn” in light of the many alternatives that are not constitutionally suspect. They accordingly do not comport with the plain teaching of Buckley.

Electoral Competition

Albuquerque’s final constitutional justification is that spending limits are necessary to promote electoral competition. Once again, I agree with the conclusion of the principal opinion — that Albuquerque has failed to show that this interest is served *920 by its spending limits. I do not believe Buckley, however, allows us to entertain this interest as a proposed rationale for spending limits.
Albuquerque’s argument is that “campaign spending poses a threat to [electoral] competition because large incumbent war chests tend to discourage serious challengers.” Supra at 913-914. Thus, the City contends that spending caps are needed to equalize candidate resources, which in turn may improve electoral competition. This interest, like the others urged on us here, however, was considered and rejected by the Buckley Court. Addressing the argument that spending limits are necessary “to equalize the relative ability of individuals and groups to influence the outcome of elections,” the Court stated,
[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.
424 U.S. at 48-49, 96 S.Ct. 612 (quotations omitted). The Supreme Court couched its language broadly in response to the argument that spending caps are necessary to “encourage participation as candidates by many who in the past remained inactive on the ground that, inevitably, they could not compete against the established fund-raiser.” Buckley, Br. of Attorney General & FEC at 36.[4] The Buckley Court, however, rejected this claim: “[Equalization of permissible campaign expenditures might serve not to equalize the opportunities of all candidates but to handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign.” 424 U.S. at 56-57, 96 S.Ct. 612.
Thus, I believe Buckley does effectively “preclude[ ] this court from recognizing robust electoral competition as a state interest sufficiently compelling to justify the expenditure limits.” Cf. supra at 913-914. Because the Supreme Court has rejected this proposed rationale, this court should make clear to trial courts and future potential litigants that time and money spent attempting to build a record justifying spending restrictions based on this argument would be wasted.
Even if encouraging competition were a compelling interest, many of the alternative proposals identified above would be less restrictive means of serving this interest. For example, increasing the number of seats, limiting the number of terms individuals can serve, raising contribution limits, and supplementing private donations with public funds all could help relatively unknown candidates amass the resources necessary to challenge a sitting officeholder without impinging on the First Amendment.

Conclusion

The principal opinion correctly notes that Buckley is the starting point for analysis in any campaign finance case. In this case, Buckley is also the endpoint because Buckley itself precludes our recognition of the reformulated interests urged on us by Albuquerque. Besides this imposing legal impediment, I see two possible consequences of the principal opinion’s analysis: *921 First, it would encourage additional attempts by governments to abridge citizens’ rights to engage in (sometimes expensive) political speech through artful restatements of the governmental interests rejected in Buckley. Second, by couching its decision on the lack of a sufficient record, rather than on the protections of the First Amendment, the principal opinion tempts heavy reliance on surveys, statistical analysis, and other time-consuming and costly forms of record building when the inevitable litigation arises from those abridgments. The Supreme Court has given us little reason to expect that new criticism of the high cost of politics will undercut the central holding of Buckley that most spending limitations are constitutionally foreclosed by the First Amendment.

. I refer to Judge Lucero's opinion as the "principal opinion” because the three judge panel is unanimous in its agreement on the result, and note that this opinion is the majority only as to Part IV.

. This is to say nothing of the inevitable unintended consequences. Some commentators suggest that a possible consequence of spending restrictions will be to drive political spending further out of the control of candidates and into the hands of independent groups. See generally Lillian R. BeVier, Money and Politics, A Perspective on the First Amendment and Campaign Finance Reform, 73 Calif. L.Rev. 1045 (1985) (noting that campaign finance reform has increased influence of interest groups).

. Not only are officeholders not required to run for reelection if they feel it interferes with their ability to represent their constituents, but if political advertisements are as ineffectual at informing voters as the City here seems to claim, see Rue Appellant’s Br. at 15-17, then surely a rational candidate would not waste much time raising money to pay for them.

. This argument undermines Albuquerque’s claim that campaign spending is not important for challengers hoping to inform or persuade voters because communication with likely voters is not expensive. See Rue Aplt. Br. at 16-17, 62-63.