**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 27 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

RICK HOMANS,

      Plaintiff - Appellee,

v.

THE CITY OF ALBUQUERQUE, a municipal corporation; FRANCIE D. CORDOVA, in her capacity as Clerk of the City of Albuquerque,

      Defendants - Appellants.

No. 02-2244

---

SANDER RUE,

      Plaintiff - Appellee,

v.

THE CITY OF ALBUQUERQUE, a municipal corporation; FRANCIE D. CORDOVA, in her capacity as Clerk of the City of Albuquerque; THE CITY OF ALBUQUERQUE BOARD OF ETHICS AND CAMPAIGN PRACTICES, a board of the City of Albuquerque,

      Defendants - Appellants.

No. 02-2316

**Appeals from the United States District Court
for the District of New Mexico
(D.C. No. CIV-01-917 MV/RLP)
(D.C. No. CIV-01-1036 JP/LFG)**

Brenda Wright (Lisa J. Danetz, National Voting Rights Institute, Boston, Massachusetts; Robert M. White, City Attorney, and Randy M. Autio, Deputy City Attorney, Albuquerque, New Mexico, with her on the briefs), National Voting Rights Institute, Boston, Massachusetts for Defendants-Appellants in 02-2244.

Thomas C. Bird (Richard L. Alvidrez with him on the brief), Keleher & McLeod, P.A., Albuquerque, New Mexico for Plaintiff-Appellee in 02-2244.

Lisa J. Danetz (Brenda Wright, National Voting Rights Institute, Boston, Massachusetts; Robert M. White, City Attorney, and Randy M. Autio, Deputy City Attorney, with her on the briefs), National Voting Rights Institute, Boston, Massachusetts for Defendants-Appellants in 02-2316.

James Bopp, Jr., (Henry M. Bohnhoff, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, New Mexico; and Paul M. Kienzle, III, Scott & Kienzel, PA, Albuquerque, New Mexico with him on the brief), Bopp, Coleson & Bostrom, Terre Haute, Indiana for Plaintiff-Appellee in 02-2316.

Before **LUCERO**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

**LUCERO**, Circuit Judge.

In response to the increasingly apparent need to reform the ways in which political campaigns are financed, the city of Albuquerque implemented a campaign-finance reform system in 1974. It adopted limits on campaign

expenditures and contributions in municipal elections. In 2001, mayoral candidate Rick Homans brought a challenge under the First and Fourteenth Amendments[1] to the mayoral-candidate expenditure restriction; ruling in favor of Homans, the district court permanently enjoined enforcement of this limit. City-council candidate Sander Rue brought a similar suit challenging the expenditure limit for city-council candidates and obtained a favorable summary judgment as well. Both cases are before us on review, and because they present similar issues, we consolidate them for review. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The following expresses the opinion of the court as to parts I, II, and III. As to part IV, it concurs in part with the opinion of Judge Tymkovich, which constitutes the majority opinion of the court as to part IV.

## I

As part of an overall restructuring of its city government in 1974, Albuquerque amended its city charter and implemented an election code imposing disclosure requirements and limiting expenditures and contributions for municipal elections. More than ninety percent of voters approved these reform measures. As it reads today, the election code provides:

---

[1] Protections afforded under the First Amendment have been incorporated into the Fourteenth Amendment to apply against the states. Everson v. Bd. of Educ., 330 U.S. 1, 13–15 (1947).

No candidate shall allow or accept contributions or make expenditures in excess of the following for any election:

1.      To a candidate for the office of Councillor, contributions or expenditures equal to twice the amount of the annual salary paid by the City of Albuquerque to Councillors as of the date of filing of the Declaration of Candidacy.

2.      To a candidate for the office of Mayor, contributions or expenditures equal to twice the amount of the annual salary paid by the City of Albuquerque to the Mayor as of the date of filing of the Declaration of Candidacy.

Albuquerque City Charter, art. XIII, sec. 4(d).[2]  Candidate-expenditure restrictions were in effect for each mayoral and city-council election from 1974 to 1995.  Limits on the 1997 election were temporarily enjoined pursuant to a court order; however, parties to that litigation stipulated dismissal of the lawsuit, and the spending limits were restored for the 1999 election.  For the 2001 elections, the mayoral-campaign expenditure limit was $174,720; city-council candidates were limited to spending a maximum of $17,056.  Violation of these limits carries a fine of up to $500 per violation, removal from office, and/or public reprimand.

After filing suit in federal district court on August 10, 2001, plaintiff Rick Homans filed a motion for a preliminary injunction, which was denied on September 1, 2001.  Homans v. City of Albuquerque, 160 F. Supp. 2d 1266

---

[2] Albuquerque's city charter also caps individual contributions at five percent of the annual salary of the office.  Id. at sec. 4(e).  The propriety of the contribution limits, which theoretically would appear to allow twenty individual contributors to fund one hundred percent of a campaign at the full expenditure limitation level, is not before us.

(D.N.M. 2001) ("Homans I"). He then filed an interlocutory appeal on September 4, 2001, seeking an emergency injunction pending appeal. Two days later, a two-member motions panel of this court granted the request and enjoined enforcement of the expenditure limit pending review of the merits. Homans v. City of Albuquerque, 264 F.3d 1240, 1245 (10th Cir. 2001) (per curiam) ("Homans II"). In doing so, the motions panel held that Homans established a likelihood of success on the merits regarding his claim that the expenditure limit violated the First and Fourteenth Amendments under Buckley v. Valeo, 424 U.S. 1 (1976) (per curiam). Homans II, 264 F.3d at 1243–44.

On February 13, 2002, the parties filed a joint motion for stipulated admission of evidence and expedited determination on the merits in district court. The district court entered a declaratory judgment in favor of Homans and permanently enjoined enforcement of the provision in August 2002. Homans v. City of Albuquerque, 217 F. Supp. 1197 (D.N.M. 2002) ("Homans III"). While the court stated its own view that the expenditure limitations restriction survives exacting scrutiny under Buckley, it found the contrary conclusion mandated by the motions-panel's ruling in Homans II. Homans III, 217 F. Supp. at 1206. Albuquerque appeals.

Plaintiff Sander Rue was a duly qualified candidate for District Five City Councillor who also ran in the October 2001 election. In his suit filed in federal

district court in September, 2001, he claimed that the city-council campaign-expenditure limitation violates <u>Buckley</u>.  The district court granted summary judgment in favor of Rue and permanently enjoined enforcement of the city-council restriction on October 11, 2002, relying on the motions-panel's ruling in <u>Homans II</u> and the district court's decision in <u>Homans III</u>.  <u>Rue v. City of Albuquerque</u>, Civ. No. 01-1036 JP/LFG (D.N.M. Oct. 11, 2002).  Albuquerque appeals.[3]

## II

As to the grant of summary judgment in Rue's case, we review the district court's decision de novo, applying the same standards used by the district court and construing the facts in the light most favorable to Albuquerque.  <u>See</u> <u>Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1326 (10th Cir. 1999).

With regard to the final decision in <u>Homans III</u>, we ordinarily review the district court's legal conclusions de novo, <u>Dang v. UNUM Life Ins. Co. of Am.</u>, 175 F.3d 1186, 1189 (10th Cir. 1999), and its factual findings for clear error.  Fed. R. Civ. P. 52(a).  Because this case implicates First Amendment concerns,

---

[3] Although the elections have passed, this does not render the cases moot because the issues raised are "capable of repetition, yet evading review."  <u>See</u> <u>First Nat'l Bank of Boston v. Bellotti</u>, 435 U.S. 765, 774 (1978); <u>Suster v. Marshall</u>, 149 F.3d 523, 527 (6th Cir. 1998).

however, we have "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984) (quotations omitted). We therefore view the evidence objectively rather than in the light most favorable to the City.

Our standard in reviewing Rue's case is thus more favorable to the City than our standard in Homans' case. For this reason, with respect to each claim, we evaluate the evidence first in the light most favorable to the City to determine whether summary judgment was proper in Rue. Only if this less stringent standard is satisfied will we conduct an independent and objective examination of the evidence to review whether the permanent injunction in Homans' case was proper.

## III

As an initial matter, we determine whether the Homans II decision, in which a motions panel of this court granted an injunction pending appeal against the expenditure limit, has binding effect. See Homans II, 264 F.3d at 1243, 1245. Attempting to leverage this interlocutory decision to its maximum possible effect, Homans argues that the Homans II ruling constitutes the law of the case and

restricts us in our merits determination.[4]  The district court agreed, stating that although it was inclined to conclude that the expenditure limit for mayoral campaigns survives the exacting scrutiny required under Buckley, it was bound by the motions-panel ruling to conclude otherwise.  Homans III, 217 F. Supp. at 1206.  We disagree.

In general, the law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  Arizona v. California, 460 U.S. 605, 618 (1983).  Law of the case "is solely a rule of practice and not a limit on the power of the court."  Mason v. Texaco, Inc., 948 F.2d 1546, 1553 (10th Cir. 1991) (citing Messinger v. Anderson, 225 U.S. 436, 444 (1912)).  Thus, the doctrine is discretionary rather than mandatory.  Kennedy v. Lubar, 273 F.3d 1293, 1299 (10th Cir. 2001); Stifel, Nicolaus & Co. v. Woolsey & Co., 81 F.3d 1540, 1544 (10th Cir. 1996).

In the instant matter, the two judge panel decision of our court constituted an interlocutory ruling, and its holding was limited to the conclusion that Homans had shown a likelihood of success on the merits of his claim.[5]  Homans II, 264

---

[4]  In similar fashion, Rue argues that the Homans II order binds review of the merits of the city-council limits.

[5]  To the extent that any language in Homans II can be read as an assessment of the actual merits of Homans' claim, as opposed to his likelihood of
(continued...)

F.3d at 1243–44.  Courts repeatedly have emphasized that a decision as to the likelihood of success is tentative in nature and not binding at a subsequent trial on the merits.  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."); Southco, Inc. v. Kanebridge Corp., 324 F.3d 190, 195 (3d Cir. 2003); A.M. Capen's Co. v. Am. Trading & Prod. Corp., 202 F.3d 469, 473 (1st Cir. 2000).  Were the opposite true, an unacceptable conflation of the merits decision and the preliminary inquiry would result.  Moreover, if the district court were bound in the manner suggested, then the decision of the motions panel would also bind the appellate panel reviewing the merits.  This is not the rule.  When reviewing a decision by a prior motions panel, we are "uninhibited by the law of the case doctrine."  Stifel, 81 F.3d at 1544.

Our own circuit precedent expressly rejects the proposition urged by Homans and articulates the rationale for doing so.  See id. at 1543–44.  As we have explained, "a motions panel's decision is often tentative because it is based on an abbreviated record and made without the benefit of full briefing and oral argument."  Id. at 1544.  In the instant case, the motions panel did not hear oral

---

[5](...continued)
success on the merits, such language is dicta.  Dicta is not subject to the law of the case doctrine.  See In re Meridian Reserve, Inc. v. Bonnett Res. Corp., 87 F.3d 406, 410 (10th Cir. 1996).

argument, and briefing proceeded on an expedited schedule in light of the impending election. Homans filed his motion on September 4, 2001, and the City was required to submit its response the next day; the motion was granted on the following day, September 6, 2001. In light of this truncated schedule and the "avowedly preliminary [and] tentative" nature of the emergency-injunction ruling, Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 69 (3d Cir. 1999) (quotation omitted), a motions-panel ruling does not establish the law of the case; therefore, neither the district court nor this court is constrained in its review of the merits by the September 6 ruling.[6] Accordingly, we reject Homans' argument and hold that the district court erred in concluding that it was bound by the law of the case doctrine.

## IV

We proceed to the merits of Homans' and Rue's claims. Although the two cases stand in differing procedural postures, they raise an identical substantive claim: that the campaign-expenditure limits in the Albuquerque City Charter violate the First and Fourteenth Amendments.

Every challenge to campaign-finance reform provisions must begin with an analysis of the watershed case of Buckley v. Valeo, 424 U.S. 1 (1976). Analyzing

---

[6] From this it follows that neither the district court considering Rue's claim nor this court in reviewing that decision is constrained by the Homans II ruling.

- 10 -

the 1974 amendments to the Federal Election Campaign Act ("FECA"), the Supreme Court developed a jurisprudential distinction between restrictions on campaign expenditures and restrictions on campaign contributions. Although both types of restrictions limit core political speech and are therefore subject to "exacting scrutiny," id. at 16, the Court concluded that expenditure limits impose "significantly more severe restrictions on protected freedoms" than limits on contributions. Id. at 22. As the Court explained, a "restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." Id. at 19, 22. For this reason, expenditure limits raise graver constitutional concerns and are invalidated more frequently. Id. at 55–56, 59 (upholding contribution limits but invalidating expenditure limits); see also McConnell v. Fed. Election Comm'n, 540 U.S. ___, 24, 2003 WL 22900467 (2003) ("In Buckley and subsequent cases, we have subjected restrictions on campaign expenditures to closer scrutiny than limits on campaign contributions."); Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440 (2001) ("Colorado Republican II") ("[L]imits on political expenditures deserve closer scrutiny than restrictions on political contributions."); Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 387–88 (2000) ("Shrink Missouri") (concluding that

- 11 -

differing standards govern review of contribution limits and expenditure limits, and that contribution limits may be justified when they are "closely drawn" to serve a "sufficiently important interest"); Fed. Election Comm'n v. Mass. Citizens for Life, 479 U.S. 238, 259–60 (1986) ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending.").

Although a less stringent standard of review applies to limits on political contributions, we conclude that the standard for expenditure limits operates identically to strict scrutiny review. To be upheld, therefore, the campaign-expenditure restrictions must be both narrowly tailored, Fed. Election Comm'n v. Nat'l Conserv. Political Action Comm., 470 U.S. 480, 496 (1985) ("NC-PAC"), and necessary to serve a compelling state interest, Mass. Citizens for Life, 479 U.S. at 251–52. See also Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 657 (1990) (applying strict scrutiny to review state restrictions on corporate political expenditures); Kruse v. City of Cincinnati, 142 F.3d 907, 912–13 (6th Cir. 1998) (holding that municipal restrictions on candidate expenditures are subject to strict-scrutiny review).

In conducting strict scrutiny review, it is essential to acknowledge that such scrutiny is not "strict in theory, but fatal in fact." See, e.g., Grutter v. Bollinger, 123 S. Ct. 2325, 2338 (2003). Despite this repeated admonition by the Supreme

Court, appellees insist that <u>Buckley</u> imposes a per se ban on all candidate-expenditure restrictions.  Given the Supreme Court's distaste for "imposing judicial formulas so rigid that they become a straitjacket that disables government from responding to serious problems," <u>Denver Area Educ. Telecomm. Consortium, Inc. v. FCC</u>, 518 U.S. 727, 741 (1996), we are obliged to disagree.

In <u>Buckley</u>, defenders of FECA's restrictions on candidate expenditures proffered various rationales to justify the limits, 424 U.S. at 55–57;[7] nonetheless, the Court invalidated the expenditure cap, holding that "[n]o governmental interest <u>that has been suggested</u> is sufficient to justify the restriction."  <u>Id.</u> at 55 (emphasis added).  The Court's chosen language leaves open the possibility that at least in some circumstances expenditure limits may withstand constitutional scrutiny.  <u>See</u> <u>Kruse</u>, 142 F.3d at 920 (Cohn, J., concurring) (stating that "<u>Buckley</u> . . . is not a broad pronouncement declaring all campaign expenditure limits unconstitutional," and that it remains possible to develop a factual record that would sustain such restrictions).  Concluding that it might be possible to devise a system of campaign-expenditure limits that would survive exacting scrutiny, we evaluate Albuquerque's attempt to do so.

**A**

_____

[7]  The three rationales proffered were as follows:  (1) to deter corruption and the appearance of corruption; (2) to equalize candidates' resources; and (3) to contain the skyrocketing costs of political campaigns.

To satisfy strict scrutiny review, Albuquerque must establish that its candidate-expenditure restrictions are necessary to further a compelling state interest. Albuquerque sets forth the following rationales to justify the limits: (1) deterrence of corruption and enhancement of public confidence in the electoral process; (2) preservation of officeholders' ability to perform their duties without devoting excessive time to fundraising; and (3) encouragement of electoral competition. We address each rationale.

**1**

Speaking nearly five decades ago, Justice Frankfurter made the following assessment of the corruption and public confidence issue:

> We all know . . . that one of the great political evils of the time is the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions. Many believe that when an individual or association of individuals makes large contributions for the purpose of aiding candidates of political parties in winning elections, they expect, and sometimes demand, and occasionally, at least, receive, consideration by the beneficiaries of their contributions which not infrequently is harmful to the general public interest.

United States v. United Auto. Workers, 352 U.S. 567, 576 (1957) (quotation omitted). Some time later, the Supreme Court explained:

> Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance. Democracy works only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption.

- 14 -

Shrink Missouri, 528 U.S. at 390 (quotation omitted). Most recently, the Supreme Court reiterated the importance of preventing corruption or its appearance in the context of political contribution limits. See McConnell, 540 U.S. at 33 ("Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits."). Despite this precedent, Homans argues to no avail that as a matter of law Buckley mandates that expenditure limits can never be justified by the anti-corruption rationale.

It is well-established that the deterrence of corruption constitutes a compelling state interest. See Austin, 494 U.S. at 657–60; NC-PAC, 470 U.S. at 496–97. The question remains whether Albuquerque's expenditure limits are necessary to serve this end. See Burson v. Freeman, 504 U.S. 191, 198 (1992) (noting that exacting scrutiny requires that the regulation be necessary to serve a compelling state interest). In the particular circumstances of Buckley, the Court rejected the anti-corruption rationale in reviewing FECA's campaign-expenditure limits, concluding that the interest in preventing corruption was served adequately in that case by the federal contribution limits and disclosure provisions. Rejecting the corollary argument that expenditure limits were necessary to prevent circumvention of permissible campaign-finance provisions, the Court relied on the factual conclusion that "[t]here is no indication that the substantial criminal

penalties for violating the contribution ceilings combined with the political repercussions of such violations will be insufficient." 424 U.S. at 26, 55–56. Attaching significance to the fact that FECA permitted successful candidates to retain contributions in excess of expenditure limits and to use these funds for any lawful purpose, the Buckley Court explained: "This provision undercuts whatever marginal role the expenditure limits might otherwise play in enforcing contribution ceilings." Id. Contrary to appellees' contention, Buckley does not preclude the use of expenditure limits to further a state's anti-corruption interest in all circumstances. Cf. Kruse, 142 F.3d at 915 (acknowledging that Buckley may be interpreted to leave open the possibility that the anti-corruption rationale may, under some circumstances, justify candidate-expenditure caps).

Nor are we persuaded that subsequent case law prohibits the use of expenditure caps to deter corruption as a matter of law. In Kruse, the Sixth Circuit reached the opposite conclusion and held that NC-PAC and Colo. Republican Federal Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604 (1996) ("Colorado Republican I") "make eminently clear that spending limits . . . are unconstitutional not simply because of the presence of contribution limits but because they are not narrowly tailored to serve this interest." 142 F.3d at 915. We conclude that this view reads too much into NC-PAC and Colorado Republican I.

In NC-PAC, the Court invalidated restrictions on political action committees' independent expenditures when the spending was not coordinated with a campaign; the court did not address the permissibility of restrictions on candidate expenditures. 470 U.S. at 496–98. Even were NC-PAC's reasoning to apply to restrictions on candidate expenditures, its holding would be limited to the facts in that case. The Court's explicit holding was that "[o]n this record, . . . an exchange of political favors for uncoordinated expenditures remains a hypothetical possibility and nothing more." Id. at 498 (emphasis added). Similarly fact-bound is the holding in Colorado Republican I, in which the Supreme Court invalidates limits on spending by political parties, which are treated as "independent expenditures." 518 U.S. at 613–19. The Court based its conclusion on the absence of coordination between the candidate and the source of the expenditure, which prevented the Court from assuming, "absent convincing evidence to the contrary, that a limitation on political parties' independent expenditures is necessary to combat a substantial danger of corruption of the electoral system." Id. at 617–18 (emphasis added). Both NC-PAC and Colorado Republican I thus explicitly leave open the possibility that in certain circumstances, a factual record may establish "convincing evidence" and thus justify the need for expenditure limits to reduce corruption or the appearance of corruption.

Unfortunately for Albuquerque, we conclude that the record in this case does not aggregate to such "convincing evidence." As a consequence, we are bound to reject the contention that the City's expenditure limits are <u>necessary</u> to deter corruption. The City submits the following as evidence to support its position: (1) evidence demonstrating the ease with which contribution limits are circumvented; (2) voter turnout statistics; (3) voter surveys; and (4) anecdotal evidence of corruption.

As to the first category of evidence, the City focuses on the use of tactics such as "bundling" at the federal level, arguing that expenditure limits are necessary to prevent circumvention of contribution limits. Assuming that such evidence could demonstrate that expenditure limits are necessary to reduce corruption,[8] we are not persuaded that bundling practices at the federal level are

_____

[8] Notably, evidence of circumvention of contribution limits, <u>standing alone</u>, could not sustain the more onerous burdens imposed by expenditure limits:

> The discussion in [the earlier section of the <u>Buckley</u> Opinion] explains why the Act's expenditure limitations impose far greater restraints on the freedom of speech and association than do its contribution limitations. The markedly greater burden on basic freedoms caused by [FECA's independent expenditure provision] thus cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations.

<u>Buckley</u>, 424 U.S. at 44; <u>see also</u> <u>Kruse</u>, 142 F.3d at 915–16 (holding that <u>Buckley</u> expressly rejects the argument that spending caps are justified by the need to enforce contribution limits).

comparable to those at the local level.  Although the City is entitled to rely on evidence from other jurisdictions to justify campaign-finance reform measures, Shrink Missouri, 528 U.S. at 394 & n.6 (citing Renton v. Playtime Theaters, Inc. 475 U.S. 41, 51–52 (1986)), it may only do so if the evidence relied upon is "reasonably believed to be relevant to the problem that the city addresses."  Id. The City does not proffer any argument, much less evidence, suggesting that local bundling practices are analogous to federal ones.

But the City's evidence of the need to deter corruption is not limited to documenting bundling at the federal level—the City introduces additional, independent evidence of the public appearance of corruption.  Submitting statistics on Albuquerque voter turnout, the City argues that, contrary to common claims that expenditure limits suppress voter turnout, Albuquerque voters are more likely to vote when expenditure limits are imposed.  Recognizing a positive relationship between voter turnout and the public perception of corruption is not unprecedented; as earlier noted, the Supreme Court has articulated, "Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance."  Shrink Missouri, 528 U.S. at 390.[9]  To establish the

_____

[9]  This statement suggests that turnout rates correlate with expenditure limits because expenditure limits decrease the perception of corruption, which in

(continued...)

relationship in the instant case, the City submits that in Albuquerque elections from 1974 until 2001, an average of 40.3% of registered voters participated in all city elections for which the spending limits were in place.[10]  This figure is particularly impressive when compared to the 25 to 35% turnout rate for city elections nationally.  This comparison figure, however, is based on the percentage of the voting-age population, not the percentage of registered voters as it was in the Albuquerque figure; indeed, a calculation of Albuquerque voter turnout as a percentage of the voting age population reveals a turnout rate of only 28.3% between 1984 and 1989.  While these figures may cast doubt on the suggestion that spending limits inhibit turnout rates, they assuredly do not establish the affirmative of the proposition:  that Albuquerque's spending limit actually increases turnout rates, as the City's own expert readily concedes.[11]

---

[9](...continued)
turn increases turnout.  Albuquerque, however, suggests another reason for the relationship between turnout rates and expenditure limits—one which does not implicate the anti-corruption rationale.  It proffers the somewhat counterintuitive claim that expenditure limits improve the public's knowledge base, which in turn increases turnout.  Implicitly, then, Albuquerque suggests that expenditure limits are necessary not only to further an interest in deterring corruption, but also to further an interest in enhancing the electorate's knowledge.

[10]  The data for the two elections for which spending limits were enjoined are as follows:  in the 1997 election, only 33% of registered voters turned out; in the 2001 election, however, an impressive 42.4% voted.

[11]  Kruse implicitly rejected a similar argument that turnout rates might be used to demonstrate the need to further an interest other than anti-corruption.  142
(continued...)

Telephone survey results[12] are submitted by Albuquerque in support of its argument that expenditure limits are necessary to combat the public perception of corruption.[13] This survey evidence does suggest that Albuquerque voters have more confidence in the integrity of local elections than federal elections, which have no spending limits. On the other hand, appellees' evidence also suggests that voters generally trust local government more than state and federal government, regardless of spending limits. Albuquerque's survey results demonstrate that voters think that the removal of spending limits increases the potential for corruption. By contrast, appellees' evidence suggests that the

---

[11](...continued)
F.3d at 916. Because we are unpersuaded that turnout rates in fact correlate with expenditure limits, we have no occasion to reach this issue.

[12] Survey results are an acceptable form of evidence to demonstrate the need for campaign-finance reform measures. Shrink Missouri, 528 U.S. at 394; Mont. Right to Life Ass'n v. Eddleman, 306 F.3d 874, 882 (9th Cir. 2002); Daggett v. Comm'n on Governmental Ethics Elections, 205 F.3d 445, 457–58 (1st Cir. 2000).

[13] The City's evidence is the result of a telephone survey conducted in August 1998 by Lake Snell Perry & Associates of 400 registered voters who reside in Albuquerque. These results have a margin of sampling error of +/- 4.9%.
    Appellees' argument that majoritarian views cannot dictate the bounds of First Amendment protections is misplaced. Such barometers of public sentiment are relevant in the campaign-finance context, to the extent that they show the need to remedy a public perception of corruption. See, e.g., Shrink Missouri, 528 U.S. at 394.

amount of spending in an election does not affect voter cynicism when other variables are controlled.

Anecdotal evidence supports Albuquerque's contention that special interests are perceived to exercise an undue influence in elections. For example, a New Mexico State Senator described the local influence of contributions from certain industries. Specifically, she cited the influence of the alcohol industry in delaying legislation to prohibit "drive-up windows" for the purchase of alcohol, and the influence of the gambling industry in obtaining favorable revenue-sharing compacts with the state. An expert in the field of campaign-finance, Larry Makinson, testified to a correlation between legislative voting and campaign-contributions at the federal level,[14] citing as an example the Tauzin-Dingell bill.

While recognizing the possibility that the government may provide sufficient evidence of the need for candidate-expenditure caps to prevent corruption, we nonetheless conclude that the evidence before us, even viewed in the light most favorable to Albuquerque, is no more compelling than the evidence the Court effectively rejected in Buckley. 424 U.S. at 29. In Buckley, FECA's defenders also submitted survey evidence suggesting that the public perceived

---

[14] Neither the utilization of candidate issue questionnaires as a tool to achieve such correlation nor the propriety of such questionnaires in the fundraising and lobbying process was presented to the district court and we do not reach the issue.

undue influence by special interests and anecdotal evidence of corruption surrounding the 1972 election; indeed, the Buckley evidence was of a far greater magnitude than that presented here and smelled of actual quid pro quo. See id. at 27 n. 28 (referencing Buckley v. Valeo, 519 F.2d 821, 839–40, & nn. 36–38 (D.C. Cir. 1975) for evidence documenting the undue influence of the dairy industry, illegal corporate contributions, and promise of diplomatic posts in exchange for hefty campaign contributions). While undoubtedly troubling, Albuquerque's evidence does not approach the palpable sense of corruption prompting the federal amendments in 1974. Because the Buckley evidence was held insufficient to demonstrate that FECA's candidate-expenditure limits were necessary to serve the compelling state interest in deterring corruption, we are compelled to conclude that Rue is entitled to summary judgment. A fortiori, we hold that the evidence in Homans' case, which need not be viewed in the light most favorable to the City, fails to sustain the City's burden.

## 2

Thus far, the Supreme Court has recognized the existence of but one state interest sufficiently compelling to justify campaign-finance regulation: the anti-corruption rationale. See NC-PAC, 470 U.S. at 496–97. This initial recognition does not, of course, foreclose the possibility that other compelling state interests may be identified in future cases, and in the case on review Albuquerque submits

- 23 -

evidence of additional interests that it claims justify campaign expenditure caps. The City argues that the caps are necessary to serve the compelling state interest of preserving officeholders' time and enabling them to perform official duties. Claiming that "when campaign spending is unlimited, as is true for congressional elections, fundraising becomes a full-time job for candidates and officeholders fearful of being outmatched by an opponent's spending," the city submits evidence documenting the fundraising burdens of candidates and officeholders. (Homans Appellant's Br. at 52; Rue Appellant's Br. at 54.)

In <u>Kruse,</u> the Sixth Circuit concluded that the need to preserve officeholders' time and ability to perform official duties is merely a restatement of the containing-skyrocketing-campaign-costs rationale rejected in <u>Buckley</u>:

> The need to spend a large amount of time fundraising is a direct outgrowth of the high cost of campaigns. However, because the government cannot constitutionally limit the cost of campaigns, the need to spend time raising money, which admittedly detracts an officeholder from doing her job, cannot serve as a basis for limiting campaign spending.

142 F.3d at 916–17. We view the <u>Kruse</u> court's conflation of the two rationales as inaccurate and conclude that the preservation of officeholders' time is wholly separate. In <u>Buckley,</u> the Court rejected the proffered rationale of containing the skyrocketing costs of campaigns as follows: "[T]he <u>mere</u> growth in the cost of federal election campaigns <u>in and of itself</u> provides no basis for governmental restrictions on the quantity of campaign spending and the resulting limitation on

- 24 -

the scope of federal campaigns." 424 U.S. at 57 (emphasis added). Albuquerque does not merely rely on the skyrocketing costs of campaigns in and of themselves; rather, the City cites an additional reason why increasingly expensive campaigns hurt the electoral system: the woes of poor challengers aside, such campaigns distract officeholders from performing their official duties. Buckley makes no mention of this rationale and thus does not necessarily preclude the recognition of this as a compelling state interest.

To show that its campaign-expenditure limits are necessary to further this interest, Albuquerque submits excerpts from the book Speaking Freely containing interviews of retired congressional representatives that present a disturbing view into the fundraising pressures imposed on federal candidates. Additionally, the City cites statements made by local officials describing the time pressures imposed by fundraising in the absence of expenditure limits. Dede Feldman, a New Mexico State Senator who also ran for Albuquerque City Council in 1995, compares the differences in state campaigns versus Albuquerque campaigns:

> Campaigning with and without spending limits is very different . . . . Because there was unlimited spending and I had to raise more money in the Senate races, I spent a lot more time fund-raising and I tried to raise money from larger contributions . . . . Doing so much fund-raising was incredibly time-consuming and cut into my other campaigning and my regular job. The fund-raising had to be done during the day and I therefore had less time to do my regular job. In addition, I had less time to engage in direct contact with the voters by going door-to-door.

(2 Rue R. Doc. 47 at 708–09.)  In discussing the fundraising burden imposed during the recent election for which spending limits were enjoined, former mayor Jim Baca comments,  "As a result of this new money chase in this year's mayoral election in Albuquerque, I am now forced to spend three hours every day making fundraising phone calls.  I have never before had to do this in my political career."  (2 Homans Doc. 24 at 512.)  On the other hand, other evidence in the record suggests that the strain on Albuquerque officials' time in the absence of spending limits is not significantly greater than when a spending limit is in place.  For example, Michael Guerrero, who entered the 1999 City Council race while the spending limit was in place, testified that he spent between ten to fifteen hours per week raising funds.

Limited to the record before us, we cannot conclude that Albuquerque has submitted sufficient evidence to demonstrate that candidate-expenditure caps are necessary to further the state's interest in protecting officials' abilities to conduct their jobs.  While it may seem so to candidates at the time, we are not convinced that the burdens imposed on Albuquerque officeholders' time amounts to a problem of constitutional proportions.  The claim that fundraising prevents officeholders from engaging in alternative campaign tactics such as individual door-to-door contact is interesting.  Albuquerque does not articulate any reason why there is a compelling state interest in channeling campaign resources to favor

individual voter contact rather than fundraising tactics. There is no indication in the record that, for example, the added burden of fundraising events and phone calls is more demanding on an officeholder's time than the burden of individual voter contact.

Nor does the record persuade us that individual voter contact is a fundamentally superior campaign strategy because fundraising efforts compromise an officeholder's ability to communicate with the public. Given the individual contribution-limits in Albuquerque, officeholders are likely to communicate with a broad swath of potential fundraisers in much the same way they would communicate with the public through door-to-door contact; records of past campaign contributors do not suggest that the target for contribution solicitations differs significantly from the general Albuquerque public at large. On the contrary, candidate Guerrero states that time spent on fundraising cannot be distinguished from time spent on other campaign tactics because "a lot of times when you're fund-raising, you're also campaigning." (3 Rue R. Doc. 52 at 760.) We take this to mean that the message disseminated in fundraising efforts often coincides with the message disseminated through voter contact—they are generally one and the same; the City makes no effort to rebut this assumption. For these reasons, we hold that Albuquerque's evidence, even when viewed in the

light most favorable to the City, fails to demonstrate that expenditure limits are necessary to further a compelling state interest in preserving officeholders' time.

**3**

Finally, the City argues that campaign-spending limits are necessary to further the state interest in promoting electoral competition. One expert in the field of campaign-finance reform explains:

> Electoral competition is another central component of democratic governance. In many respects, the ultimate weapon of public accountability in a democratic system is the ability of citizens to remove political actors through elections. And, electoral competition is the mechanism that keeps accountability viable . . . . High levels of campaign spending poses a threat to such competition because large incumbent war chests tend to discourage serious challengers.

(2 Rue R. Doc. 43 at 674.) Homans argues that this merely rehashes the equalization-of-candidate-resources rationale rejected in Buckley.[15] See Buckley, 424 U.S. at 56 (rejecting the argument that equalizing candidates' resources constitutes a compelling state interest). In Buckley, however, the Court spoke solely to the equalization of candidate resources; it did not address the possible rationale of improving electoral competition. Id. at 48–49, 56–57. We are persuaded that the improvement of electoral competition constitutes an interest distinct from the equalization-of-candidate-resources rationale rejected in Buckley. Thus, nothing precludes this court from recognizing robust electoral

---

[15] Notably, Rue does not raise this argument.

competition as a state interest sufficiently compelling to justify the expenditure limits.

We do not resolve this question because there is insufficient evidence in the record, even when viewed in the light most favorable to the City, to establish that spending limits actually enhance electoral competition. While the City's statistical evidence does tend to undercut the doomsday prediction that spending limits discourage competition by insulating incumbents, it falls short of proving the contrary—that spending limits actually improve electoral competition—as the City's own expert admits. Even were we to assume that enhancement of electoral competition constitutes a compelling state interest, there is insufficient evidence in this record to show that expenditure limits serve this end.

**B**

We conclude that Albuquerque's evidence, even when viewed in the light most favorable to the City, fails to establish that its candidate-expenditure limits are necessary to serve a compelling state interest. Thus, summary judgment in favor of Rue was proper. It follows that the City's evidence in Homans III, which need not be viewed in the light most favorable to Albuquerque, fails to sustain its burden, and the permanent injunction was appropriately granted. Given these holdings, we have no occasion to determine whether the expenditure limits are narrowly tailored. It is clear from the record, and from the many other cases

dealing with the problem, that there is an increasing drive, and need, for campaign finance reform. We do not intend by our holding—that Albuquerque has failed in the instant case to demonstrate a compelling state interest for its expenditure provisions—to discourage future efforts in reforming our electoral system; we merely hold that on the record before us, Albuquerque has failed to justify its expenditure limits.

Other jurisdictions have attempted alternative measures to eradicate corruption: limiting the size of campaign contributions, improvement of electoral competition, enhancement of voter participation, and preservation of candidates' scarce time resources, and they have done so within constitutional bounds. Notably, the Court has stated that public financing measures including expenditure limits may be implemented to achieve these ends without running afoul of the First Amendment. See Buckley, 424 U.S. at 57 n.65 ("Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations."). As for the prescription before us–a rigid limitation of campaign expenditures—Albuquerque has failed to submit sufficient evidence of a compelling state interest justifying such limits.

For the foregoing reasons, we **AFFIRM** both decisions of the district court.

Nos. 02-2244, 02-2316, *Homans v. City of Albuquerque; Rue v. City of Albuquerque*; **TYMKOVICH**, J., affirming, concurring in part and concurring in the result. **O'BRIEN**, J. joins.

I agree with much of Judge Lucero's analysis and with the ultimate disposition of the issues on appeal. Specifically, I concur with Parts I, II, and III, and with the analysis of Part IV that is not inconsistent with the following.[1] I write separately for two reasons: First, to explain what I view as the Supreme Court's narrow application of *Buckley's* anti-corruption rationale in campaign expenditure cases. Second, to demonstrate why the other rationales submitted by the City – preservation of officeholder time and promoting electoral competition – are fundamentally at odds with *Buckley* and its progeny.

The principal opinion's careful analysis of the evidence presented by Albuquerque leads it to the undoubtedly correct conclusion that the City's campaign spending restrictions are unconstitutional. I, however, would agree with the Sixth Circuit's holding that under *Buckley* such restrictions cannot be supported as a matter of law. *See Kruse v. City of Cincinnati*, 142 F.3d 907, 915-19 (6th Cir. 1998). In particular, I would hold that while prevention of corruption has been recognized as a compelling interest justifying campaign contribution limits, it was specifically rejected by *Buckley* as a sufficient reason to limit direct campaign spending. Further, in my view the two "new" interests the City asserts

_____

[1] I refer to Judge Lucero's opinion as the "principal opinion" because the three judge panel is unanimous in its agreement on the result, and note that this opinion is the majority only as to Part IV.

in defense of the statute are neither new nor compelling, nor are the spending caps tailored narrowly to serve them. Since all three of the asserted interests are thus constitutionally incapable of justifying spending restrictions as a matter of law, the court need not entertain the evidence submitted by the City.

<u>Strict Scrutiny and *Buckley v. Valeo*</u>

It is true that strict scrutiny does not require automatic invalidation of governmental regulations. *See Grutter v. Bollinger*, 123 S. Ct. 2325, 2338 (2003). Nevertheless, where core First Amendment principles are at stake, courts must bring a healthy skepticism to claims that individuals spend too much time and money on the political process. Unless the City convinces us that its regulations are necessary to serve a compelling interest, *see Federal Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 251-52 (1986), and are narrowly tailored to serve that interest, we must invalidate them. *See Federal Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496 (1985) ("*NCPAC*").

While I agree it is theoretically possible to bring evidence of corruption in support of spending limitations under *Buckley*, we should be careful not to credit attempts to reformulate arguments that the Supreme Court rejected long ago. *Buckley's* strong affirmation of the free speech rights associated with campaign spending has remained essentially untouched for nearly thirty years. *See*

*McConnell v. Fed. Election Comm'n*, 124 S. Ct. 619, 655 (2003) (reemphasizing

heightened level of scrutiny for restrictions on campaign expenditures). Its

central holding on expenditures has stood the test of time, both from judicial

tinkering and legislative onslaught. That Albuquerque's spending caps have

evaded judicial review for more than 25 years is quite a feat. After careful

deliberation, however, the City's limits cannot stand under well-established

precedent.

I agree that the *Buckley* Court did not adopt a per se rule against campaign

spending limits. The Court began by explaining the particular importance of First

Amendment rights in the arena of political campaigning:

> In a republic where the people are sovereign, the ability of the
> citizenry to make informed choices among candidates for office is
> essential, for the identities of those who are elected will inevitably
> shape the course that we follow as a nation. As the Court observed
> in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), "it can
> hardly be doubted that the constitutional guarantee has its fullest and
> most urgent application precisely to the conduct of campaigns for
> political office."

*Buckley*, 424 U.S. at 14-15.

The Court went on to address specifically how spending limits

impinge upon this right:

> A restriction on the amount of money a person or group can spend on
> political communication during a campaign necessarily reduces the
> quantity of expression by restricting the number of issues discussed,
> the depth of their exploration, and the size of the audience reached.

This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

*Id.* at 19 (footnote omitted). It concluded with a broad holding that government does not have the right to pass judgment on how or why a person expends campaign resources:

The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government but the people – individually as citizens and candidates and collectively as associations and political committees – who must retain control over the quantity and range of debate on public issues in a political campaign.

*Id*. at 57.

As Justice White observed in dissent, this is not the language of a Court limiting its decision to the facts before it, or interested in encouraging governments to enact similar restrictions with more elaborate justifications. *See id.* at 266 ("The Court . . . holds that a candidate has a constitutional right to spend unlimited amounts of money, mostly that of other people, in order to be elected.") (White, J., dissenting).

The hundreds of pages of campaign finance opinions written by the Supreme Court beginning with *Buckley* and culminating most recently with *McConnell* may not have left us with many clear rules, but one remains intact: "The central holding in [*Buckley*] is that spending money on one's own speech must be permitted. . . ." *Colorado Republican Fed. Campaign Comm. v. Fed.*

*Election Comm'n*, 518 U.S. 604, 627 (1996) (Kennedy, J., concurring in part and dissenting in part). Thus, the Supreme Court has "*routinely* struck down limitations on independent expenditures by candidates." *Federal Election Comm'n v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 441 (2001) ("*Colorado II*") (emphasis added); *see also McConnell*, 124 S.Ct. at 655 (reiterating that expenditure limitations will be more closely scrutinized).

One can safely conclude that *Buckley* forecloses a finding that spending limitations can be narrowly tailored to further governmental justifications other than the anti-corruption interest sustained by the Supreme Court, no matter what evidence may be presented. In short, the City must do more than offer academic distinctions of the rationales rejected in *Buckley*. Albuquerque failed to do so here.

Corruption and Campaign Expenditures

While I agree with the principal opinion that strict scrutiny does not establish a "per se" restriction on campaign spending schemes, it does set a high standard. The Supreme Court likens "corruption" to the "subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial quid pro quo: dollars for political favors." *NCPAC*, 470 U.S. at 497. Nevertheless,

while the Supreme Court has routinely upheld contribution limits under the corruption rationale, it has equally routinely struck down spending restrictions. *See Colorado II*, 533 U.S. at 440-41. The reason for the difference is the Court's determination – grounded in law and common sense – that expenditures by a candidate to promote the candidate's political agenda do not pose a particular risk of corrupting the *candidate* making the expenditure.

While more recent cases appear to have taken a slightly broader view of the corruption rationale on the contribution limits side of the equation, *see, e.g., Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 389 (2000) (expressing concern about "the broader threat from politicians too compliant with the wishes of large contributors"), the Supreme Court as a whole has not yet shown any willingness to do so on the spending side. The Supreme Court's skeptical view of spending limitations in *Buckley* is based on a realistic appraisal of modern campaigning. Conveying a campaign message to a large electorate can be costly, whether it is by direct mail, television, radio, or staged events. *See Buckley*, 424 U.S. at 19-20. While technological innovations such as the internet may make it more economical to reach some segments of the electorate, overall costs are unlikely to go down anytime soon. The bottom line is that political speech can only be communicated where a candidate has the resources to get his views out. *See id.* at 19, 57.

The quality of contemporary political communications may give us pause, but the First Amendment does not have an exception for messages we find repetitive, in poor taste, or too hard-hitting. The answer to concerns about political campaigning, however, does not rest in arbitrary limits that reduce the amount of speech available to the public with no reduction in real or perceived corruption by candidates or elected officials.[2] The Supreme Court has made it clear that a *candidate's* expressing his political views is not corrupting: "There is nothing invidious, improper, or unhealthy in permitting [legally-raised] funds to be spent to carry the candidate's message to the electorate." *Id*. at 56. In other words, the candidate's spending does nothing to corrupt the candidate. "If a [] candidate can raise $1 from each voter, what evil is exacerbated by allowing that candidate to use all that money for political communication?" *Id*. at 56 n.64 (quoting *Buckley v. Valeo*, 519 F.2d 817, 917 (D.C. Cir 1975) (Tamm, J., dissenting in part)). Thus, candidate spending limitations cannot be justified by the anti-corruption rationale. *Id.* at 55-57. This is because "[t]he markedly greater burden on basic freedoms caused by [spending limits] cannot be sustained

---

[2] This is to say nothing of the inevitable unintended consequences. Some commentators suggest that a possible consequence of spending restrictions will be to drive political spending further out of the control of candidates and into the hands of independent groups. *See generally* Lillian R. BeVier*, Money and Politics, A Perspective on the First Amendment and Campaign Finance Reform*, 73 Calif. L. Rev. 1045 (1985) (noting that campaign finance reform has increased influence of interest groups).

simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limits." *Id.* at 44.

There is no basis to retreat from *Buckley's* essential teaching that campaign spending restrictions are not narrowly tailored to further the governmental interest in reducing corruption. I therefore agree with the Sixth Circuit that "campaign spending limits cannot be justified by the anti-corruption rationale." *Kruse*, 142 F.3d at 915. Thus, while Judge Lucero is correct in finding that Albuquerque put forth insufficient evidence to show that its spending limits were necessary to prevent corruption, I doubt that any evidence would sustain such limitations under *Buckley*.

Fund-raising Burdens on Candidates

Albuquerque advances a second rationale for spending caps: they relieve elected officials of the heavy burden of raising the money they need to spend to get reelected. The principal opinion disagrees with Homans's and Rue's argument that this is simply a reformulation of the cost-control rationale considered and rejected by the Supreme Court in *Buckley*. The opinion distinguishes *Buckley*'s holding that the "allegedly skyrocketing cost of political campaigns" is not an interest that can support spending restrictions, 424 U.S. at 57, by concluding that the *Buckley* Court was concerned only with "the woes of poor challengers," not the distractions faced by officeholders. *Supra* at 24.

It is true that the woes of underfunded challengers and the distractions of officeholders are not the same, and *Buckley* does not explicitly mention the latter. Both concerns are, however, aspects of the broader interest in controlling the costs of campaigns, an issue the *Buckley* Court did consider and firmly reject. The Court said, "The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise." *Buckley*, 424 U.S. at 57. This is not limited to protecting the interests of underfunded challengers. The Court is clearly and explicitly addressing whether the government may wrest from "the people – individually as citizens and candidates and collectively as associations and political committees – control over the quantity and range of debate on public issues in a political campaign" because it feels the time and money spent on campaigns could be better utilized on other endeavors. *Id.* If the "*mere* growth" of the cost of campaigns "provides *no* basis for governmental restrictions on the quantity of campaign spending," *see id.* (emphasis added), a mere consequence of that growth – more time spent fund-raising – certainly cannot provide such a basis. This is so even if Albuquerque's city councilors believe candidates are spending wasteful, excessive, or unwise amounts of money on their campaigns or if candidates would prefer to have more time for other activities.

Because *Buckley* rejected this broad argument in favor of spending caps, it did not need to address each of the numerous subordinate arguments the parties in that case put forth. But it is worth noting that contrary to the City's contention the *Buckley* Court did consider the exact argument made here, that the "thirst for money has forced candidates to divert time and energy to fund-raising and away from other activities, such as addressing the substantive issues." *Buckley*, Br. of Appellees Center for Public Financing of Elections, Common Cause, League of Women Voters of the United States at 72-73 (quoting Senator Humphrey: "Campaign financing is a curse. It's the most disgusting, demeaning, disenchanting, debilitating experience of a politician's life. It's stinky. It's lousy. I just can't tell you how much I hate it.").

Since *Buckley* is directly controlling, I would again agree with the Sixth Circuit and reject this proposed justification without reaching the details of Albuquerque's arguments. *See Kruse*, 142 F.3d at 916-17 ("[T]he need to spend time raising money, which admittedly detracts an officeholder from doing her job, cannot serve as a basis for limiting campaign spending.").

The principal opinion nonetheless deals effectively with the City's factual arguments on this point. That legislators might wish to free themselves from the pressures of fund-raising is not surprising. Fund-raising is hard work and can be quite time consuming. Few candidates reportedly like it. What is surprising is

that many commentators, normally so exacting in their criticism of the self-dealing of the political branches, are willing to accept the most optimistic projections about reform proposals' likely effects. *See generally* Lillian R. BeVier, *What Ails Us?*, 112 Yale L. J. 1135, 1138 (2003) (commenting on how most campaign finance proposals miss the reformers' target).

The principal opinion is quite right that the City presented no plausible evidence that the quality of municipal governance or legislation had been harmed by inattentive law makers, nor that elected officials' work product would substantially improve because the officials could spend more time on the job. It is doubtful that Albuquerque's elected officials would admit that they have been unable to provide quality governance despite the rigors of campaigning. In any event, courts are not in a position to make such judgments about the quality of legislation based on such an illusory rationale. *See Buckley*, 424 U.S. at 57.

Furthermore, contrary to former Mayor Baca's concerns about the increased burdens of fund-raising (itself an echo of the complaints of the appellees in *Buckley*), officeholders are not "forced" to spend any time making calls or otherwise seeking funds.[3] That they choose to do so (allegedly at the expense of

---

[3] Not only are officeholders not required to run for reelection if they feel it interferes with their ability to represent their constituents, but if political advertisements are as ineffectual at informing voters as the City here seems to claim, *see* Rue Appellant's Br. at 15-17, then surely a rational candidate would

(continued...)

- 11 -

their other duties) seems to be a rather weak reason to override core First Amendment concerns. Freeing politicians from having to make that choice is not a compelling governmental interest.

Finally, of course, whatever the merits of spending limits, they must be narrowly tailored to further the constitutional justification. By way of example, as the principal opinion notes, an approach whose constitutionality has been sanctioned by *Buckley* is an obvious solution. *Buckley* upheld voluntary spending limits on presidential campaigns where the candidate accepts public funds. 424 U.S. at 85-86. If the City's elected officials and its voters truly feel obliged to limit campaign spending, they should be willing to put their money (tax dollars) where their mouths are. A public funding scheme would presumably take fund-raising pressure off of elected officials and also allow challengers to forego the rigors of purely private fund-raising. Another approach would be to raise limits on *contributions*. Candidates could then save time by seeking fewer, larger, donations. Not only would this free up candidates' time, but it would also lessen any pressure to evade low contribution limits. Albuquerque's contribution limits are currently set at five percent of the spending caps; while the record does not

---

[3](...continued)
not waste much time raising money to pay for them.

- 12 -

disclose the governmental rationale for this formula, there is no reason the City could not revisit these limits in response to the realities of modern campaigning. State and local governments are also free to limit the number of times an individual can run for the same office. Another simple solution would be to expand the number of seats in a given elective body, in this case the Albuquerque City Council. With fewer constituents to represent, and fewer potential voters to persuade, candidates would have to spend less time on all forms of campaigning, including fund-raising.

In short, Albuquerque's restrictions do not further the objective of reducing corruption. Nor are they "closely drawn" in light of the many alternatives that are not constitutionally suspect. They accordingly do not comport with the plain teaching of *Buckley*.

### Electoral Competition

Albuquerque's final constitutional justification is that spending limits are necessary to promote electoral competition. Once again, I agree with the conclusion of the principal opinion – that Albuquerque has failed to show that this interest is served by its spending limits. I do not believe *Buckley*, however, allows us to entertain this interest as a proposed rationale for spending limits.

Albuquerque's argument is that "campaign spending poses a threat to [electoral] competition because large incumbent war chests tend to discourage

serious challengers." *Supra* at 27-28.  Thus, the City contends that spending caps are needed to equalize candidate resources, which in turn may improve electoral competition.  This interest, like the others urged on us here, however, was considered and rejected by the *Buckley* Court.  Addressing the argument that spending limits are necessary "to equalize the relative ability of individuals and groups to influence the outcome of elections," the Court stated,

> [T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.

424 U.S. at 48-49 (quotations omitted).  The Supreme Court couched its language broadly in response to the argument that spending caps are necessary to "encourage participation as candidates by many who in the past remained inactive on the ground that, inevitably, they could not compete against the established fund-raiser." *Buckley*, Br. of Attorney General & FEC at 36.[4]  The *Buckley* Court, however, rejected this claim: "[E]qualization of permissible campaign expenditures might serve not to equalize the opportunities of all candidates but to

---

[4] This argument undermines Albuquerque's claim that campaign spending is not important for challengers hoping to inform or persuade voters because communication with likely voters is not expensive. *See* Rue Aplt. Br. at 16-17, 62-63.

handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign." 424 U.S. at 56-57.

Thus, I believe *Buckley* does effectively "preclude[] this court from recognizing robust electoral competition as a state interest sufficiently compelling to justify the expenditure limits." *Cf. supra* at 28. Because the Supreme Court has rejected this proposed rationale, this court should make clear to trial courts and future potential litigants that time and money spent attempting to build a record justifying spending restrictions based on this argument would be wasted.

Even if encouraging competition were a compelling interest, many of the alternative proposals identified above would be less restrictive means of serving this interest. For example, increasing the number of seats, limiting the number of terms individuals can serve, raising contribution limits, and supplementing private donations with public funds all could help relatively unknown candidates amass the resources necessary to challenge a sitting officeholder without impinging on the First Amendment.

Conclusion

The principal opinion correctly notes that *Buckley* is the starting point for analysis in any campaign finance case. In this case, *Buckley* is also the endpoint because *Buckley* itself precludes our recognition of the reformulated interests urged on us by Albuquerque. Besides this imposing legal impediment, I see two

possible consequences of the principal opinion's analysis: First, it would encourage additional attempts by governments to abridge citizens' rights to engage in (sometimes expensive) political speech through artful restatements of the governmental interests rejected in *Buckley*. Second, by couching its decision on the lack of a sufficient record, rather than on the protections of the First Amendment, the principal opinion tempts heavy reliance on surveys, statistical analysis, and other time-consuming and costly forms of record building when the inevitable litigation arises from those abridgments. The Supreme Court has given us little reason to expect that new criticism of the high cost of politics will undercut the central holding of Buckley that most spending limitations are constitutionally foreclosed by the First Amendment.